CUMMINGS, ATTORNEY GENERAL, ET AL. *v.* DEUTSCHE BANK UND DISCONTOGESELL-SCHAFT.

No. 254.   Argued January 4, 5, 1937.—Decided February 1, 1937.

*Assistant Attorney General Morris,* with whom *Solicitor General Reed* and *Messrs. Harry LeRoy Jones* and *Charles A. Horsky* were on the brief, for petitioners.

*Messrs. James J. Lenihan* and *Otto C. Sommerich,* with whom *Mr. Thomas H. Creighton, Jr.,* was on the brief, for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This is a suit in equity brought October 3, 1934, by respondent in the supreme court of the District of Columbia [1] against petitioners praying a decree directing delivery of property seized by the Alien Property Custodian and withheld by petitioners under the Trading with the Enemy Act from "Direction der Disconto Gesellschaft,"

---

[1] Now the "district court of the United States for the District of Columbia." Act of June 25, 1936, 49 Stat. 1921.

an alien enemy. Petitioners moved to dismiss the bill upon the ground that the court had no jurisdiction to entertain it because by Public Resolution No. 53 of June 27, 1934, 48 Stat. 1267, the return of the money and property sought has been postponed. The court sustained the motion and dismissed the bill. The court of appeals reversed. 65 App. D. C. 297; 83 F. (2d) 554. This court granted a writ of certiorari.

In substance the bill alleges: Respondent, a German corporation, was created in 1929 by consolidation of Deutsche Bank and Direction der Disconto Gesellschaft. After the merger, the assets of the latter became respondent's property. The Custodian determined the Disconto Gesellschaft to be an alien enemy and seized its money and property in this country, which was held by the Custodian and deposited in the Treasury. Respondent, acting under the Settlement of War Claims Act and in accordance with the Custodian's rules and regulations, filed notice of claim to the property and applied to the President for its return. Before commencement of this suit, the Custodian found it entitled to the property. In March, 1931, Sprunt and others brought an action in the supreme court of the District of Columbia against respondent; a warrant of attachment issued and, pursuant to it, the marshal levied on the money and property so held; because of the attachment petitioners refused to deliver it to respondent and retained custody. In May, 1934, that action was discontinued by plaintiffs and the attachment was released. July 1, 1934, the office of Custodian ceased; his powers and duties were transferred to the Department of Justice; all money and property held by or in trust for him was transferred to the Attorney General. Before commencement of this suit, respondent demanded and petitioners refused delivery of that here in question. Their refusal was based on Public Resolution No. 53.

The questions for decision are whether that resolution withdrew from the trial court jurisdiction to entertain the bill, and whether it deprives respondent of its property without due process of law in contravention of the Fifth Amendment.

1. This is in substance a suit against the United States. *Banco Mexicano* v. *Deutsche Bank*, 263 U. S. 591, 603. *Becker Steel Co.* v. *Cummings*, 296 U. S. 74, 78. By the Trading with the Enemy Act of 1917, § 9 (a) (b) (c),[2] as amended by the Settlement of War Claims Act, § 11,[3] the United States consented, in respect of claims such as the one here in question, to be sued in the supreme court of the District of Columbia. Petitioners maintain Resolution No. 53 withdrew that consent.

The recitals of that resolution disclose reasons for its adoption. They are: A joint resolution of July 2, 1921,[4] declared that property of German nationals held under the Trading with the Enemy Act should be retained and no disposition thereof made, except as specifically provided by law, until the German Government should make suitable provision for the satisfaction of claims of American nationals against it. The Treaty of Berlin, August 25, 1921,[5] accorded to the United States all rights and advantages specified in the resolution of July 2, 1921, including those stipulated for its benefit in the Treaty of Versailles,[6] not ratified by the United States. The agreement of August 10, 1922,[7] established a Mixed Claims

---

[2] Act of October 6, 1917, § 9, 40 Stat. 419, as amended by Acts: July 11, 1919, 41 Stat. 35; June 5, 1920, 41 Stat. 977; February 27, 1921, c. 76, 41 Stat. 1147; December 21, 1921, c. 13, 42 Stat. 351; December 27, 1922, c. 13, 42 Stat. 1065; March 4, 1923, § 1, 42 Stat. 1511; May 7, 1926, c. 252, 44 Stat. 406.

[3] Act of March 10, 1928, 45 Stat. 270.

[4] 42 Stat. 105.

[5] 42 Stat. 1939.

[6] Sen. Doc. No. 348, 67th Cong., 4th Sess., p. 3329.

[7] 42 Stat. 2200.

Commission to adjudicate claims of American nationals against Germany. And, in the debt-funding agreement of June 23, 1930,[8] Germany agreed to pay the United States on account of its awards 40,800,000 reichmarks in each year until 1981. Germany was in arrears under that agreement and had failed to make provisions for satisfaction of claims established against it.

Therefore, the resolution declared: So long as Germany is in arrears in respect of obligations mentioned, all deliveries of property authorized to be made under the Trading with the Enemy Act of 1917, as amended, or the Settlement of War Claims Act of 1928 as amended, "whether or not a judgment or decree has been entered with respect thereto, shall be postponed and the money or property, or the income, issues, profits, and/or avails thereof reserved . . . Provided . . . That the President may, in his sole discretion, remove the restriction as to any of the cases . . . in relation to which . . . deliveries have been postponed under this resolution . . ."

The consent of the United States to be sued was revocable at any time. *Lynch* v. *United States*, 292 U. S. 571, 581. It has not been expressly recalled and, unless by Resolution No. 53 impliedly withdrawn, the supreme court of the District had jurisdiction to entertain the complaint. Continuation of the consent was not inconsistent with the purpose of the resolution. The measure was adopted because of Germany's default which, as indicated by the context, was assumed not to be permanent. It was intended only temporarily to postpone final disposition of the seized property, merely to stay deliveries whether directed by administrative order or judgment of a court. Claimants may have deliveries whenever Germany ceases to be in arrears. Fulfillment of her promises will end the restraint imposed

---

[8] Report of the Secretary of the Treasury, 1930, p. 341.

by the resolution. Postponement of deliveries does not suggest intention to withdraw consent to be sued. It was given and long continued in order to safeguard former owners against erroneous administration of measures enacted for their benefit. Neither need nor reason has been suggested for change of policy in that regard. In the absence of unmistakable expression of purpose to that end, it may not reasonably be inferred that Congress intended to withdraw that protection. Cf. *Becker Steel Co.* v. *Cummings, supra,* 80. We find nothing to warrant that inference. *District of Columbia* v. *Eslin,* 183 U. S. 62, gives no support to petitioners' contention. Clearly the trial court had jurisdiction to entertain the complaint.

2. Public Resolution No. 53 is not repugnant to the Fifth Amendment. By exertion of the war power, and untrammeled by the due process or just compensation clause, Congress enacted laws directing seizure, use and disposition of property in this country belonging to subjects of the enemy. Alien enemy owners were divested of every right in respect of the money and property seized and held by the Custodian under the Trading with the Enemy Act. *United States* v. *Chemical Foundation,* 272 U. S. 1, 9–11. *Woodson* v. *Deutsche, etc. Vormals,* 292 U. S. 449, 454. The title acquired by the United States was absolute and unaffected by definition of duties or limitations upon the power of the Custodian or the Treasurer of the United States. Congress reserved to itself freedom at any time to dispose of the property as deemed expedient and right under circumstances that might arise during and after the war. Legislative history and terms of measures passed in relation to alien enemy property clearly disclose that from the beginning Congress intended after the war justly to deal with former owners and, by restitution or compensation in whole or part, to ameliorate hardships falling upon them as a

result of the seizure of their property.[9]   But that intention detracted nothing from title acquired by the United States or its power to retain or dispose of the property upon such terms and conditions as from time to time Congress might direct.   As the taking left in enemy owners no beneficial right to, or interest in, the property, the United States did not take or hold as trustee for their benefit.

Respondent maintains that § 11 of the Settlement of War Claims Act of 1928, amending § 9 of the Trading with the Enemy Act of 1917 as amended, vested in former owners an immediate right to the return of their property and that, having complied with the provisions of the Act, they cannot be deprived of that right.   It argues that its interest in the property taken was not "completely and irrevocably destroyed" and that the Settlement of War Claims Act was an Act under which it "could and did obtain a vested interest in its property." To the extent that the argument rests upon the assumption that the taking did not divest enemy owners of every right or that the United States did not acquire absolute title, it is fallacious and need not be noticed.

The Settlement of War Claims Act was not a conveyance and did not grant former owners any right or title to, or interest in, the money or property taken by the Custodian.   As amended by it, pertinent provisions of the Trading with the Enemy Act are indicated in the margin.[10]

---

[9] Sen. Rep. No. 113, 65th Cong., 1st Sess.   Trading with the Enemy Act of October 6, 1917, § 12, 40 Stat. 423.   Public Resolution No. 8, July 2, 1921, § 5, 42 Stat. 106.   Cong. Rec., Vol. 61, Part 4, p. 3249.   Winslow Act of March 4, 1923, § 2, 42 Stat. 1516, adding § 23 to Trading with the Enemy Act.   Sen. Rep. No. 273, 70th Cong., 1st Sess., pp. 12–13.   Settlement of War Claims Act of March 10, 1928, 45 Stat. 254.

[10] Section 9 (b) of the Trading with the Enemy Act, as amended by § 11 of the Settlement of War Claims Act, 45 Stat. 270—in substance

No change of title was effected by that Act; and in proceedings under it none takes place before delivery to claimant. As the United States owned all, claimant's consent to postponement of delivery of part did not improve its position as to the rest. The President did not order delivery. Action by him was neither a condition precedent nor a bar to suit. The statute, § 9 (a), required the money and property to be retained by the Custodian or Treasurer until final judgment for claimant should be satisfied by delivery, or until final judgment against claimant. It is clear that when the resolution was adopted respondent had neither title nor vested right to have delivery.

The grant to former alien enemy owners of the privilege of becoming entitled upon conditions specified to have

so far as pertinent here—declares that if the President shall determine that the owner at the time of the taking was a German corporation and that written consent (provided for in subsection (m) of § 9 as amended) to postponement of return of 20 percent of the money or property has been filed, then the President without any application being made therefor "may order the payment, conveyance, transfer, assignment, or delivery of such money or other property held by the Alien Property Custodian or by the Treasurer of the United States" to the owner from whom taken.

Section 9 (c) declares that any person whose property the President is authorized to return under the provisions of subsection (b) (and plaintiff's predecessor is such a person) may serve notice of claim for the return of the money or property taken from him as provided in subsection 9 (a) (which relates to claims by others than enemies for property taken from them by the Custodian) and thereafter "may make application to the President for allowance of such claim and/or may institute suit in equity to recover such money or other property, as provided in said subsection, and with like effect. The President or the court, as the case may be, may make the same determinations with respect to citizenship and other relevant facts that the President is authorized to make under the provisions of subsection (b) hereof."

And § 9 (a) provides that any person not an enemy or ally of an enemy claiming money or property taken by the Custodian may file

returned to them the property of which they had been deprived by exertion of the war power of the United States was made by the Congress in mitigation of the taking and in recognition of "the humane and wise policy of modern times." *Brown* v. *United States,* 8 Cranch 110, 123. In *United States* v. *White Dental Co.,* 274 U. S. 398, it appears that during the war the German government sequestered the property of a German corporation which, through ownership of all its capital stock, was controlled by an American corporation. Speaking of the taking we said (pp. 402–403): "What would ultimately come back to it [the American owner], as the event proved, might be secured not as a matter of right, but as a matter either of grace to the vanquished or exaction by the victor . . . It would require a high degree of optimism to discern in the seizure of enemy property by the German government in 1918 more than a remote hope of ultimate salvage from the wreck of the

---

with him a notice of claim under oath and in form and substance as required; and the President, if application is made by claimant, may order the payment or delivery to claimant of the money or property so held by the Custodian or Treasurer. If the President shall not so order within 60 days or if the claimant shall have filed the required notice and made no application, then claimant may institute a suit in equity "to establish the interest, right, title . . . so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled. If suit shall be so instituted, then such money or property shall be retained in the custody of the Alien Property Custodian, or in the Treasury of the United States, as provided in this Act, and until any final judgment or decree which shall be entered in favor of the claimant shall be fully satisfied by payment or conveyance, transfer, assignment, or delivery by the defendant, or by the Alien Property Custodian, or Treasurer of the United States on order of the court, or until final judgment or decree shall be entered against the claimant or suit otherwise terminated."

124

war." We think it clear that the grant by the Settlement of War Claims Act was made as a matter of grace and so was subject to withdrawal by Congress. *United States* v. *Teller,* 107 U. S. 64, 68. *Frisbie* v. *United States,* 157 U. S. 160, 166. *Lynch* v. *United States, supra,* 577. The resolution does not infringe the Fifth Amendment.

*Reversed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.