SOCIETE SUISSE POUR VALEURS DE METAUX v. CUMMINGS, Atty. Gen., et al.

No. 6978.

United States Court of Appeals for the District of Columbia.

Argued April 11, 1938.

Decided July 25, 1938.

Frederic D. McKenney, John S. Flannery and G. Bowdoin Craighill, all of Washington, D. C., for appellant.

Sam E. Whitaker, Asst. Atty. Gen., and Harry LeRoy Jones, Brice Toole, and Enoch E. Ellison, Attys., Department of Justice, all of Washington, D. C., for appellees.

Before GRONER, Chief Justice, and STEPHENS and EDGERTON, Associate Justices.

GRONER, C. J.

Societe Suisse Pour Valeurs De Metaux (called herein Swiss Corporation) filed its bill in the court below September 4, 1930, against the Attorney General (as Acting Alien Property Custodian) and the Treasurer of the United States to recover the sum of $643,595.81, which had accrued as interest on money received by the Custodian from the sale of shares of stock of American Metal Company taken over by him during the war. Metallgesellschaft and Metallbank, two German corporations, were at the outbreak of the war record holders of 49% of the capital stock of American Metal Company, a New York corporation. The shares were seized pursuant to the Trading with the Enemy Act, 50 U.S.C.A. Appendix § 1 et seq. and were subsequently sold by the Custodian. In September, 1921 the Custodian caused to be paid to Swiss Corporation in money and government bonds the sum of $6,967,987.-30, representing the aggregate principal amount of the sale of the shares. At the time of payment there had been no allocation of the interest accrued during the period of seizure, but subsequently under Section 15 of the Act of March 10, 1928,[1] the Custodian set aside under two trusts the sum of $643,595.81 from that source. He declined, however, to pay this sum to Swiss Corporation because in May, 1926 the former Custodian and the former Attorney General had been indicted in the Southern District of New York for having fraudulently and unlawfully paid to Swiss Corporation the original principal sum. After the instant suit was begun the Attorney General and Treasurer filed an answer and a counterclaim. In the former they denied that any sum was due or payable to Swiss Corporation and in the latter sought restitution of the amount previously paid on the ground that the original claim was fraudulent and the money and bonds procured thereby unlawfully obtained.

On motion the trial court entered an order striking the counterclaim and denying the right to cross relief. We allowed a special appeal and in June, 1936 reversed the order with instructions to the lower court to permit the counterclaim to be filed.[2] Thereafter the cause was tried before Judge O'Donoghue, and in February, 1937 a decree was entered dismissing the bill and decreeing in favor of the United States on the counterclaim in the sum of $6,967,987.30.

The findings of facts and conclusions of law were announced immediately at the close of the argument. Counsel for Swiss Corporation excepted to the findings on the ground that they were inadequate, insufficient, and did not meet the requirements of Federal Equity Rule 70½ (296 U.S. 671), 28 U.S.C.A. following section 723 and unsuccessfully urged the court to make additional findings, and they now claim error as the result of the court's refusal to amplify the findings.

Undoubtedly the findings leave much to be desired. We have had occasion recently to emphasize the necessity of compliance with the rule (Boss v. Hardee, 68 App.D.C. 75, 93 F.2d 234), and the Supreme Court more recently still, Interstate

---

[1] 45 Stat. 254, 273, 50 U.S.C.A.Appendix § 26 et seq.

[2] 66 App.D.C. 121, 85 F.2d 287.

390

Circuit, Inc. et al. v. United States, 304 U.S. 55, 58 S.Ct. 768, 82 L.Ed. 1146 (decided April 25, 1938), has called attention to the fact that an opinion by the trial judge is not a substitute for the required findings nor a discussion of the evidence and the court's reasoning in its opinion, sufficient to constitute the special and formal findings by which it is the duty of the court appropriately and specifically to determine all the issues which the case presents. In cases requiring findings of facts it is the better practice to insist that counsel for the prevailing party submit to the court and to the adverse party proposed findings. Thereafter a time should be set at which objections and proposed modifications, eliminations, or additions may be submitted and then, if necessary, a hearing had and the findings settled. In the instant case it would have been better if the findings had not been interwoven with conclusions of law and interspersed with expressions of the court's opinion on the merits; but by disregarding the extraneous matter there is enough left to enable us to determine the issues which the case presents.

As a matter of real fact there is but a single issue involved, for in the view we take of the case, the question whether Richard Merton as the representative of Swiss Corporation was privy to the bribery of Miller,[3] the Custodian, need not be decided.

So far as is involved here we shall assume that Swiss Corporation was at all times during the period of the war an alien friend. In that view if the shares of stock of the American Metal Company seized by the Custodian during the war rightfully belonged to it before April 6, 1917, the seizure was unlawful,[4] the restitution made in 1921 was proper, and the accumulated interest allocated to the trusts should now be paid to it. Contrarily, if the stock of American company did not then belong to Swiss Corporation, but belonged to Metallbank and Metallgesellschaft, alien enemies, the payment in 1921 was in fact unlawful, whether induced by bribery or not. And this brings us to a consideration of the evidence.

Metallgesellschaft was formed in 1881 under the laws of Germany as a trading company in metals. It was organized and controlled by the Merton family. Metall-

bank was formed prior to the war, also by the Merton family, with the idea of keeping separate the industrial and financial sides of the family business. The boards of the two companies were much the same, and Richard Merton was managing director of Metallgesellschaft, and his father of Metallbank. On the death of his father, Richard became chairman of the board of Metallbank. Swiss Corporation was organized in 1910, mainly by the elder Merton, as a holding company, and it acquired by purchase from the two German companies several million dollars of their capital shares. The latter companies held 51% of the capital of Swiss Corporation at all times during the period with which we are concerned. Long prior to the World War the two German companies acquired 49% of the capital stock of American Metal Company. The share certificates were deposited for the account of the German corporations with the American corporation at its New York office. After the United States entered the war the president of American company reported this enemy ownership of stock to the Alien Property Custodian, who took possession of the certificates under the Trading with the Enemy Act (40 Stat. 411, 50 U.S.C.A. Appendix § 1 et seq.). The stocks were subsequently sold by the Custodian.

Richard Merton came to the United States in March, 1921 and consulted Mr. Dulles, a New York lawyer, relative to filing a claim in the name of Swiss Corporation for the fund held by the Custodian. Dulles went to Washington and made an investigation and informed Merton that the claim would not be allowed without litigation. Merton thereafter met John T. King, a Connecticut politician, whom he interested in the case, and through King he was introduced to Jess Smith, of Ohio, a friend of the then Attorney General, and to Miller, the Custodian. By this means Merton had an interview with George E. Williams of the Custodian's office and obtained the information which he thought necessary in the preparation of the claim of Swiss Corporation. He then returned to Europe and later brought back with him to this country the prepared claim papers which were submitted to the Custodian through either King or Smith. One or the other told Merton "that he had put up the claim in the wrong way" and

---

[3] Miller v. United States, 2 Cir., 24 F. 2d 353.

[4] Schrijver v. Sutherland, 57 App.D.C. 214, 19 F.2d 688.

not as he had been told, as the result of which he asked for and had a further conference with Williams to find out what was wrong. Williams apparently explained that the papers as prepared showed a "debt claim" rather than an "ownership claim" to the seized property and for that reason could not be allowed. Merton was permitted to withdraw the papers and to take them with him to Switzerland for redrafting.

He returned to Washington with the new claim papers the last of August or the first of September, 1921, and within two or three days after their delivery to the Custodian he was notified by either King or Smith that the claim had been allowed; and at the suggestion of Smith or King a dinner party was arranged at the Ritz-Carlton in New York City, attended by Merton, Miller, Smith, and King. At that time treasury checks in the amount of approximately six and a half million dollars were delivered to Merton, followed by the delivery the next day or the day after of Liberty Bonds in the amount of approximately $500,000. Merton paid King for his services about $400,000 in government bonds,—having previously paid him $50,000 in cash,—and a week or ten days later returned to Europe.

In 1926 Miller, Attorney General Daugherty, and King were indicted on account of the transaction just described, for violation of Section 37 of the Criminal Code, 18 U.S.C.A. § 88. King died, Miller was convicted, and the jury disagreed as to Daugherty. Miller appealed, and the judgment of conviction was affirmed February 6, 1928. In the criminal trial Merton testified as a witness for the United States, insisting in his testimony, however, that he had never authorized King or Smith to make any payments to any officials of government to expedite or to allow the claim. Thus the matter remained until the present suit was begun.

The United States insist that Swiss Corporation never was owner of the American Metal Company stock, but that the shares belonged at all times to the two German companies; that the statement of claim of Swiss Corporation filed and allowed in 1921 by the Custodian was false and fraudulent; and that its allowance was obtained by bribery. Swiss Corporation, on the other hand, insists that it acquired the stock by assignment prior to the entry of the United States

into the World War; that it was entitled to make the claim; that the United States have wholly failed in this case to prove that its claim was fraudulent; and that in any case the allowance of the claim by the Attorney General was final.

But in the view we take of this case the government was not required to prove that the claim made in 1921 was fraudulent,—for the reason that Swiss Corporation was entitled to the money it received only if it was, prior to the commencement of the war, the owner of the American company stock. The answer to this question will, without more, determine whether the government may now prevail on its counterclaim.

And this brings us back to the point from which we started.

■ The trial in the court below was on depositions and oral testimony. Ordinarily we should be satisfied to follow the general rule and accept the findings unless clearly wrong. Hearst Radio, Inc. v. Good, 67 App.D.C. 250, 91 F.2d 555. In view, however, of the important nature of the deposition and documentary evidence, we have considered it our duty to weigh the whole evidence, for as to the former we are as able to determine its effect as was the trial court. Photoplay Pub. Co. v. La Verne Pub. Co., 3 Cir., 269 F. 730, 732.

■ We find here a case in which a Swiss company secured payment of a supposedly valid claim to seized property by representing that it was the lawful owner. As we have already said, if it really was not the lawful owner, it was not entitled to the money it received. Not being satisfied with what it got by the allowance of its claim, it brought this suit in order to compel the government to pay over to it the retained interest accumulation. In our decision on the former appeal, we said:

"When the corporation brought this suit, it invited the court to which it submitted itself to go behind the settlement, and at the instance of the United States, the real parties in interest, to re-examine all the questions arising out of the original claim."

We think this is a correct statement of the law, and hence that the United States are not foreclosed by the action of the former Attorney General. McElrath v. United States, 102 U.S. 426, 440, 441, 26 L.Ed. 189.

Swiss Corporation insists that the United States, as the parties alleging fraud, must prove it by clear, unequivocal, and convincing testimony, and that such proof will not arise from a bare preponderance of evidence which leaves the issue in doubt.[5] But we think the rule is not applicable in the view we have taken of the case and in the narrow limits to which we have confined it. Here, as we have seen, the question is:—Were the shares of stock the property of Swiss Corporation? If not, the only answer is that Swiss Corporation was not entitled to receive the proceeds of their sale. And so the question of actual fraud may be said to be out of the case. We go far enough when we hold, as we do, that the United States as to the counterclaim had the burden throughout.

As we understand the evidence and the arguments, the case for Swiss Corporation is as follows: The German corporations owned the American company stock prior to 1910. In that year those two corporations desired to increase their capital and to strengthen their cash position and accordingly formed the Swiss Corporation and sold to it large blocks of their own stocks. At the time of these sales "representatives" of the German corporations exhibited to Swiss Corporation their financial statements for the purpose of showing the value of their stocks, and as an inducement to the purchase. On the strength of these representations and on its holdings of the German corporations' stocks, the Swiss Corporation issued debentures which were sold to the public. In March, 1916, because of the depression resulting from the war, the Swiss Corporation called upon the German corporations for assurances of the value of their stocks, and the German corporations thereupon orally acknowledged their obligations and orally referred to their holdings of American company stock as evidence of continuing value. Later, and in consequence of further depreciation, negotiations were resumed between the Swiss and German corporations in February and March, 1917 (a time when the United States and Germany had severed diplomatic relations), and the German corporations verbally transferred to the Swiss Corporation their interest in the American company stock. All these things are said to have happened in Switzerland, where the agreements were to be performed. Accordingly, it is contended that the Swiss law governs their validity, and that under Swiss law a verbal guaranty of the value of stock and a verbal transfer of ownership of stock are valid and enforceable,—so that before the United States entered the war the Swiss Corporation was legal owner of the American company stock.

This, we say, is the story which Swiss Corporation told in its claim papers and in the annexed and supporting affidavits which it submitted to the court below, including the expert opinion certificate of the Swiss lawyer, and on the strength of the case thus made it insists the payment in 1921 was lawful and proper.

Looking at the other side, we find that attached to the claim paper was a writing, called a cession, dated November 20, 1919,—after the war ended,—in the following words:

"The Metallbank and the Metallgesellschaft do hereby assign to the Swiss Bank Corporation [fiscal agent for Swiss Corporation] all their claims to the payment of the dividends and interests paid to the Custodian and their claims to the payment of the proceeds of the sale or future sale of said shares, which claims they have against the Custodian or the Government of the United States of America or against any person who is liable for the payment of the sums received by the Custodian."

Swiss Corporation contends this cession was a confirmation of the verbal transfer, although nowhere in it is any reference made to a prior transaction, verbal or written. Further, there was evidence submitted to the lower court, oral and documentary, showing that early in 1918, when the seizure of the American company stock by the Custodian was imminent, Julian B. Beaty and Henry Bruere, Treasurer and Vice-President of the American company, suggested to the Custodian the possibility of purchasing the interest of the German companies; and that in May, 1918, under licenses permitting them to trade with the enemy, they went to Switzerland and negotiated to that end

5 Public Motor Service, Inc. v. Standard Oil Company, 69 App.D.C. 89, 99 F.2d 124, decided by us June 20, 1938; Maxwell Land-Grant Case, 121 U.S. 325, 381, 7 S.Ct. 1015, 30 L.Ed. 949; Equitable Life Assur. Soc. v. Johnson, 6 Cir., 81 F.2d 543.

with Alfred Merton, George Schwartz, and Rudolph Euler, representing the German companies. The parties framed a contract, in the presence of representatives of the Swiss Corporation, wherein the German companies were described as owners of the American company stock in question and whereby they agreed to sell it to Beaty and Bruere. The purchase money, however, was not to be paid over to the German corporations until the close of the war. Because the consent of the United States government to the sale could not be obtained, the transaction was abandoned. Other evidence submitted below showed that when the Swiss Corporation first sought to collect the proceeds of the sale of the American company stock from the Custodian it wrote (Dec. 1920) to Mr. Dulles, an attorney, and told him that it had acquired its claim on November 20, 1919 (the date of the cession), from the German companies.

With this brief summary of a part of the evidence introduced below, we turn to the findings of the trial court, which were:

1. Before the year 1910 the stock of the American company was owned by the two German companies.

2. The two German companies have nothing in their minutes with regard to the alleged oral guaranty or the alleged oral transfer of the American company stock and the Swiss company has nothing in its minutes in regard to those two transactions. The German companies filed their annual reports and accounts, as required by law, during several years after 1910 and before 1920, therein expressly or impliedly indicating that the American company stock still belonged to them.

3. In 1918, after the Alien Property Custodian had seized the American company stock, the two German companies entered into a formal contract for the sale of the American company stock, putting themselves in the position of the owners thereof. The terms and conditions of this contract were known to Swiss Corporation and to some of its officers but Swiss Corporation asserted no claim to the stock and allowed the German companies to act as the owners thereof. This agreement fell through.

4. Later in 1918 the Alien Property Custodian sold the American company stock which he had seized.

5. In November 1919 the German companies executed a written assignment, transferring or undertaking to transfer to Swiss Corporation's fiscal agent the American company stock or the proceeds of the sale thereof that were held by the Alien Property Custodian. This assignment did not mention the alleged oral guaranties of 1910 or 1912, nor did it purport to be a confirmation of the transfer of the American company stock to Swiss Corporation in March 1917, nor did it state that in consideration of the assignment the German companies were being released from their guaranties.

6. In 1920 Swiss Corporation employed New York counsel in connection with its supposed claim and informed that counsel that it became the owner of the American company stock, or the proceeds of the sale thereof, by the assignment of November, 1919. Swiss Corporation did not mention to its counsel the guaranties of 1910 or 1912, or any transfer of the title or interest in this stock in March 1917.

On the basis of these evidential facts the court made a conclusion of law and fact:— that the title of the American company stock did not pass from the German companies to Swiss Corporation and that in 1921, when Swiss Corporation secured allowance of its claim, the German companies owned the stock. The attempted assignment of 1919 was ineffectual because it could not operate on property seized and held by the Custodian.

Are these findings supported by the evidence and are they sufficient to support the conclusions reached by the trial court? We think they are. We shall refer later to other matter which the trial judge did not mention, and which in our opinion strengthens the grounds of his holding Some objections to parts of the evidence upon which the findings are based were made below and have been argued here; but we shall not discuss them because we are convinced they are technical and, in or out of the record, do not affect the result.

In final analysis Swiss Corporation's contention is that its evidence is true, that the oral guaranties and the oral transfer of the American company stock were really made just as it says they were made. If we had before us nothing but the evidence of Swiss Corporation as it was revealed to the administrative officers of government in the claim papers, and if we could assume that the asserted verbal agreement to transfer the shares was the valid act of the

German corporations and was enforceable under German and Swiss law, we might easily reach a different conclusion from that which we have expressed above. But the contrary of all of this is the case. The government, as we have pointed out, has brought to light positive evidence of acts and conduct inconsistent with the story which Swiss Corporation tells; there is no proof of acts of the German corporations which would justify our holding that there was valid corporate action authorizing a verbal transfer; and there is no proof of German law and insufficient proof of Swiss law upon which to declare that the alleged verbal transfer was binding and enforceable. Hence we must make our decision upon more than the statements found in the claim papers, and viewed in this aspect we are unable to find any evidence that at any time prior to the seizure was Swiss Corporation the true and lawful owner of the American company stock. On the contrary, we are of opinion that the finding of the lower court, that not until November 20, 1919, did the German corporations undertake to assign to Swiss Corporation their interest in the American company stock, is sustained by a preponderance of the evidence.

In all that we have said heretofore it has been assumed that under the Trading with the Enemy Act no assignment by an enemy alien of property in the hands of the Custodian was valid so as to create title in the assignee unless the assignment was made prior to the time the United States entered the war. We think this is a correct assumption. Schrijver v. Sutherland, 57 App.D.C. 214, 19 F.2d 688; Sturchler v. Hicks, D.C.N.Y., 17 F.2d 321. Swiss Corporation, while admitting the correctness of the rule, says it has no applicability here because, though the written assignment of November 20, 1919, was executed after the property had been seized and was in the hands of the Custodian, the previous transactions between the German' companies and itself, which it claims began in 1910, continued through 1917, and were consummated in 1919, created definite rights in the property as to which the 1919 writing is merely the evidence. The lower court rejected this contention, and we think correctly: First, because we think the evidence shows that the representations which it is claimed were made in 1910 by the German corporations were nothing more than assurances of the sound value of the shares which Swiss Corporation acquired. The supporting affidavit states that, before the sale took place, the representatives of the German corporations did at various times declare that they guaranteed the value of the shares and the amount of the dividends of such shares and stated particularly that the real value of the shares was more than the price asked. But the "representatives" referred to in this affidavit could have been no others than the Merton family, who then controlled both corporations. There is no showing of formal corporate action, and there is a total absence of any writing or even a minute in the German or Swiss corporations' records by which the corporations themselves could be bound. Furthermore, in view of the testimony of experts on German law that a corporation could not lawfully guarantee the value of its own stock, we think it would be unjustifiable to assume, in the very teeth of the German law forbidding it, that the German corporations made a binding guaranty. We are fortified in this conclusion by the published statements of the boards of the companies in April, 1910, issued to facilitate sale of the Swiss Corporation's debentures, and which go no further than to state the opinion that the shares they were selling were amply secured because of the German corporations' sound financial condition and the fact that the dividends paid over the previous five years on the German corporations' stocks were three times more than was necessary to pay interest on the debentures.

The subsequent proceedings described by Zahn-Geigy are to the effect that in 1916 the representatives of the German corporations agreed that the holdings of those companies in the American company should serve as security for their previous representation of value, and that in 1917 they stated that they would hold their interest in the stocks of the American company to provide against a loss to Swiss Corporation. Though we were to regard this statement as a deliberate attempt on the part of these "representatives" to transfer title to the shares, it would still be true that we have no record of any corporate act authorizing or ratifying the transfer, and equally it would still be true that under German law no such transfer could lawfully be made. On the other hand, in the report of the German companies covering the business year October 1, 1917, to September 30, 1918, the statement is made to stockholders that

"our stock" in the American Metal Company, including the dividends declared and paid since the war began, remain in the hands of the American trustee for enemy property. This statement is inconsistent with the present position of Swiss Corporation that in 1916 and in 1917 the German companies had by verbal agreement transferred their entire interest in those stocks to it. We think it beyond question that, if a seller in a supposed sale continues to hold itself out as being still the owner of the property in question, considerable doubt is thrown on the buyer's claim of title. And so again, the agreement of sale of the 11th of May, 1918, to American interests was made and entered into on the written assurance by the German corporations to Bruere and Beaty that the German corporations were the owners of the stock and were fully authorized to make the sale. And, finally, the written agreement made in November, 1919 is a complete document within itself. It recites the ownership of the American Metal Company stock by the German corporations, the accretion due to the issuance of new shares by the American company, and states that in 1917 by reason of these accretions the total number of shares held by both corporations since 1917 is 31,570 shares. And the proceeds of the sale of all the shares are by that instrument assigned to Swiss Corporation. But this was done long after the seizure and at a time when an assignment was ineffective.

■ On the whole case we think the facts we have just outlined overcome the prima facie case made by Swiss Corporation and establish as clearly as a matter of this kind is capable of being established, the falsity of the claim that there was an actual transfer of the interest in the American Metal Company stock prior to November 20, 1919. In reaching this conclusion we have not found it necessary to determine the correctness of the claim of Swiss Corporation that a verbal agreement of transfer of stocks, without delivery of the certificates, by a German corporation to a Swiss corporation is as valid as a written agreement. We do comment in passing, however, on the testimony of all the experts on foreign law to the effect that under the laws of Germany it was unlawful for Metallbank and Metallgesellschaft to transfer any of their securities or assets to a foreign corporation during the period of the war, and we should be very slow to hold that those corporations had attempt-

ed to do so,—certainly that they had done so,—by a verbal representation on the part of their "representatives". In addition to this,—and as we have pointed out above, —there is the testimony that a German corporation cannot lawfully guarantee the value of its own stock. Whether a Swiss court would enforce such a guaranty if it had jurisdiction of the parties is a matter beside the point; for we regard the illegality of the alleged transaction as merely another reason for concluding that it did not in fact take place.

In saying this we are not unmindful, of course, that what Swiss Corporation claims was done could, factually, have been done. But if it was done, with the intent said to have accompanied the transaction, then not only did the corporations concerned act unlawfully, but their other contrary acts and conduct are virtually inexplicable. Because of the nature of the case and of the positions which the parties have taken, we must decide the controversy on the strength of that evidence which not only is the subject of the more convincing proof but also has the greater probative force. Upon the whole record we think there can be no doubt that during the period involved here the German companies and not Swiss Corporation owned the American company stock.

■ We think there is no basis for the claim of laches on the part of the government. No rule is better established than that the United States are not bound by limitations or barred by laches where they are asserting a public right. United States v. Beebe, 127 U.S. 338, 8 S.Ct. 1083, 32 L.Ed. 121; United States v. Porto Rico Fruit Union, 1 Cir., 12 F.2d 961, 962. Here the United States are not seeking the return of money unlawfully paid "as a mere conduit of title for private persons", as counsel suggest. The property and money delivered to Swiss Corporation in 1921 was, in our opinion, enemy property, and it is settled that under the Trading with the Enemy Act enemy property after seizure belonged to the United States to be disposed of as they pleased. Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545.

The contention is urged by Swiss Corporation that, if its "ownership" claim is rejected, recovery is still sustainable on the theory that the German companies were liable to Swiss Corporation on the guaranty,—that is to say, that recovery

may be had as on a "debt" claim. We think the preceding discussion amply disposes of this contention, for in our view of the case the one claim must fall with the other.

Affirmed.