HALBACH et al. v. MARKHAM.
Civ. No. 3425.

United States District Court
D. New Jersey.
July 21, 1952.

Thomas J. Brogan, Jersey City, N. J., for plaintiffs.

Harold I. Baynton, Asst. Atty. Gen., Director, Office of Alien Property, Grover C. Richman, Jr., U.S.Atty., Camden, N. J., and James D. Hill, David Schwartz, and Paul E. McGraw, Attys., Department of Justice, all of Washington, D. C., for defendant.

McLAUGHLIN, Circuit Judge (specially designated).

This case involves the ownership of 4725 shares of stock in General Dyestuff Corporation, a New York corporation. It was settled on January 27, 1945. In accordance with the settlement the suit was dismissed with prejudice on February 2, 1945. Almost six years later, on January 23, 1951, the pending motion under Rule 60(b) (6), 28 U.S.C., was filed on behalf of the plaintiffs. By it plaintiffs seek to vacate the judgment of dismissal, abrogate the settlement and restore the suit to the trial list. The matter was argued orally May 27, 1952, defendant's answering brief was filed June 11, 1952 and plaintiffs' reply thereto on June 23, 1952.

The grounds of the motion are that the settlement releases were executed under duress and that, in effecting the settlement, the defendant acted illegally and beyond the scope of his authority.

Several affidavits have been filed in aid of the motion. Three of these are by Ernest K. Halbach in whose name the original disputed shares of stock stood on December 6, 1940 when they were deeded in trust by him to his wife and one Colby Stilson. Stilson later resigned as trustee and

was succeeded by Halbach's brother-in-law, Franklin H. Stafford. The trust was for the benefit of Mrs. Halbach during her lifetime and gave her testamentary power of appointment. She exercised that power in favor of the two Halbach daughters, Mary Elizabeth Kemmerer and Anne Stafford Halbach (Bumsted). Mrs. Halbach's death in 1946 left the daughters as the sole beneficiaries of the trust under her will. The corpus, consisting of the proceeds of the compromise settlement, has been distributed to the daughters who are the moving parties here.

In June 1942 all shares of stock in General Dyestuff Corporation, including the Halbach shares, were vested in the Alien Property Custodian under the Trading With the Enemy Act of 1917, as amended, 40 Stat. 411, 50 U.S.C.A. Appendix, § 1 et seq., as the property of I. G. Farben Industrie, a German enemy corporation. In March 1944 the above titled action was started for the return of the stock. The Alien Property Custodian's answer put the ownership of the shares at issue. Trial of the cause was scheduled to commence January 29, 1945. On January 27, 1945 the matter was settled by the Custodian paying plaintiffs $557,500 for their claims to the stock. This was at a rate of $118 a share. A stipulation of discontinuance of the litigation with prejudice, signed by the attorneys for the parties, was filed in this court February 2, 1945. It is that stipulation which plaintiffs seek to upset by the present motion.

■ Plaintiffs' contentions respecting duress are ably marshalled and presented by counsel but even so, the showing made utterly fails to support that allegation. Aside from vague generalities, accusations and conclusions, Halbach primarily complains that:

(1). He had been indicted with others in December 1941 for an alleged anti-trust conspiracy and the indictment had not been moved for trial by the Government up to the time he executed his affidavit of January 20, 1951. He does not point to the slightest indication of bad faith in the bringing of the indictment. He recites no effort made on behalf of himself or any of the other defendants to bring on a trial of the indictment. Actually, some time after the affidavit had been executed and this very motion filed, the indictment was tried and Halbach acquitted.

(2). In July 1942, immediately after the stock of General Dyestuff had been vested in the Custodian, the Treasury blocked his bank account and those of his family. He suggests no connection between the Treasury Department and the Custodian. The named defendant, James E. Markham, in his affidavit states that there was none. What occurred was described by the chief Halbach attorney as "a minor nuisance" and in fact it was a temporary one. It will be remembered that in July 1942 we were engaged in a life and death war with Germany. There was indication in a defense deposition that Halbach had a history of connections with I. G. Farben, a key enemy industrial corporation. Though of no more than collateral interest in this litigation that may well have been the basis for the protective war time action of the Treasury.

(3). After the vesting order, in 1941 and 1942, the management of General Dyestuff was pressured to discharge him. There is no wrongful sort of pressure revealed in the proofs. Former Alien Property Custodian, Leo T. Crowley, testified in his deposition that the reasons given him by Government officers in support of their recommendations for the discharge of Halbach were " * * * that they all felt very definitely that Halbach was connected with I. G. Farben, and the chemical combine throughout the whole of Europe and South America." Mr. Crowley said that, "I never had any reason to doubt their sincerity." James P. Markham, who followed Crowley as Alien Property Custodian, said in his affidavit that members of his staff urged him to sever Halbach's connection with General Dyestuff " * * * because they were convinced that he had been a cloak for the enemy." Mr. Markham stated that he believed his assistants' recommendations were the result of their honest convictions. It happens that Halbach was retained from July of 1942 to August 1950 as consultant with General Dyestuff at a salary of ap-

proximately $60,000 a year. He was retired from this position in August 1950 at a pension of $18,000 a year. It was not until after his retirement that the instant motion was made.

(4). In January 1945 a headlined series of articles appeared in a newspaper called "P.M." These stressed Halbach's I. G. Farben connections. "P.M." was in existence for a comparatively short time. It was published in New York City and disappeared completely some years ago. Halbach states that he is convinced much of the material of the articles was secured from Government files and statements of Government personnel and he says that he has no doubt but that the articles were timed to affect the outcome of the suit. The defense concedes that the articles were probably based on material leaked or stolen from the Government. There is no showing, however, that any responsible Government officer was concerned. The chief Halbach attorney in his deposition carefully stated that he never had any reason to believe that the articles were inspired by the Government and he recalled that they were almost as critical of the Department of Justice as of Halbach. Plaintiffs do not pretend that there was such an alleged campaign or other vilification in any other newspaper or other medium at that particular time or before or since. In fact at the time when the complained of articles were published, settlement negotiations, initiated on behalf of the plaintiffs, had been proceeding for over a month and a half.

(5). Government agents questioned his wife who is now said to have been ill at that time. No justified inference can be taken from this as to who the agents are supposed to have been and by whom they were employed or that they had any knowledge of Mrs. Halbach's condition. Nor is there warrant for assuming that there was any questioning contrary to the will of Mrs. Halbach.

It is clear that discussions which led to final settlement had been started on behalf of the plaintiffs towards the last of November 1944 and had been conducted at arm's length from that time to the latter part of January 1945 by Stoddard M. Stevens, Jr., Esq., a member of the law firm of Sullivan and Cromwell, representing the plaintiffs, and Herbert Wechsler, Esq., then an Assistant Attorney General, on behalf of the defendant. The Government's position was that Halbach had apparently paid $210,000 for the acquisition of the shares; that the most plaintiffs could possibly recover was $100 a share which was the option price at which General Dyestuff could purchase the stock under an agreement to which the stock was subject; that the Custodian, because of control of General Dyestuff could, if necessary, bring about a situation where he would be able to exercise the options. Another item entering into the estimate of the Halbach stock interest was that when the shares had been transferred to the trust they had been valued at $100 a share for gift tax purposes. After several talks between the lawyers, Halbach himself attended a conference early in January 1945. He suggested that in addition to $100 a share there should be some consideration for participation in the earned surplus of the corporation from 1939 to 1944. Eventually this was resolved to an allowance of interest during those years amounting to $18 a share. The total figure of $118 a share was agreed to by both sides. The Bureau of Internal Revenue was queried and indicated that it would accept the $100 per share gift tax estimate and would view the settlement recovery as a capital transaction rather than income to the trustees.

According to Mr. Wechsler, Halbach, on the occasion he was attending the conference, asked if it was possible to discuss the anti-trust indictment against him in connection with the stock settlement. Mr. Wechsler replied that he had no authority regarding anti-trust transactions and that in any event it would be grossly improper to discuss a pending criminal case in connection with the settlement of an entirely distinct civil matter. The question of the Treasury blocking the funds of the trustees arose at a later talk. Mr. Wechsler in his affidavit says that he stated that the issue could not be included in the then pending settlement terms. He further states that until

this motion he had never heard the suggestion that Halbach was coerced into the settlement. He says that the pressures in Washington were against a settlement of the Halbach case on any terms by the Government and that he considered he ran a substantial risk of adverse criticism in recommending payment to the Halbach trustees of the substantial sum the settlement involved.

Mr. Stevens, the senior Halbach attorney throughout the case including settlement negotiations and the settlement, was subpoenaed as a witness on this motion by the Government and testified by deposition. Plaintiffs' attorney was present and participated. Halbach was also present for more than half of the examination. While the Stevens testimony was much confined through objections based on Halbach's privilege arising out of his client-attorney relationship with the witness, it is evident from the Stevens deposition that there was no duress exercised on behalf of the Government to bring about the settlement. The Halbach attorney testified, "Mr. Wechsler conducted himself, in my judgment, with propriety." He said, "The Department of Justice to me was more or less centered in Mr. Wechsler." And he never saw any evidence or observed any actions that suggested a conspiracy on the part of the Government against Mr. Halbach. He recalled nothing dishonest or unethical in the actions or conduct of the Alien Property Custodian representatives.

I have treated the trustee plaintiffs, Halbach, his wife and daughters as one single entity, which best comports with the theory of the moving parties that in the aggregate duress was exercised upon them, resulting in the alleged invalid settlement. From the entire record before me I am thoroughly satisfied that no such showing has been made which would entitle them to the relief herein sought. First and foremost, there has been a complete failure to prove duress. In addition at every stage of the proceeding, including the protracted settlement negotiations, Halbach was represented by outstanding independent counsel. And this Federal court was open to him for a consideration on the merits of his family's rights in the stock. Nor has there been offered any satisfactory explanation for an unwarrantably long delay in questioning the validity of the settlement, the release and the stipulation. All of which, among other things, expressly eliminate any thought of deprivation of free agency in Halbach and his family at the time of the execution of these instruments. Second guessing, subsequent events, hope of further gain, expediency, however worded, can never spell out duress.

Plaintiffs' second point is that neither the Custodian nor the Department of Justice possessed the power to enter into the settlement on behalf of the United States.[1]

Quite apart from whether the plaintiffs under the facts are estopped from questioning this settlement, cf. Castell v. United States, 2 Cir., 98 F.2d 88, certiorari denied 305 U.S. 652, 59 S.Ct. 244, 83 L.Ed. 422; Backus v. United States, 59 F.2d 242, 257, 75 Ct.Cl. 69, certiorari denied 288 U.S. 610, 53 S.Ct. 402, 77 L.Ed. 984, I think it

1. While plaintiffs deny the authority of both the Custodian and the Attorney General to settle this matter they seem to accept the proposition that the Attorney General was authorized to represent the Custodian. Whether they do or not the President's Executive Order of April 21, 1942, Sec. 5, Ex. Order 9142, 50 U.S.C.A.Appendix, § 6 note, had directed that "All litigation in which the Alien Property Custodian or the Office of the Alien Property Custodian is interested shall be conducted under the supervision of the Attorney General." Ordinarily speaking the Attorney General would be in charge of such litigation in any event as suits against the Custodian are in fact suits against the United States. Cummings v. Deutsche Bank, 300 U.S. 115, 118, 57 S.Ct. 359, 81 L. Ed. 545; Becker Steel Co. v. Cummings, 296 U.S. 74, 78, 56 S.Ct. 15, 80 L.Ed. 54; Banco Mexicano v. Deutsche Bank, 263 U.S. 591, 603, 44 S.Ct. 209, 68 L.Ed. 465. And the Attorney General is responsible for this type of litigation. Cf. Sutherland v. International Insurance Co., 2 Cir., 43 F.2d 969, certiorari denied 282 U.S. 890, 51 S.Ct. 103, 75 L.Ed. 785.

is clear that both the Attorney General and the Alien Property Custodian had the authority on behalf of the United States to settle the Halbach stock claims as they did.

Plaintiffs do not question the authority of the Attorney General acting for the United States in disposing of litigation as exemplified in the Confiscation Cases, 7 Wall. 454, 19 L.Ed. 196; Castell v. United States, supra, and New York v. New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937, but they seek to restrict the scope of those decisions to an allowance of some latitude to the Attorney General in determining conditions under which he will cease to prosecute for the Government or will abandon an appeal. Those decisions do not permit of such restriction. The Confiscation Cases opinion is the leading one in the field. That was also an enemy property case. It concerned a group of Southern ships and arose under the Act of August 6, 1861. The Government had obtained judgments against six of the ships and these had been appealed to the Supreme Court. In that tribunal, the Attorney General, over the objection of the informer, moved to reverse and remand those judgments in order that the cases might be dismissed below. This was in accordance with an agreement with the claimants. The court allowed the motion saying:

> "Appointed, as the Attorney-General is, in pursuance of an act of Congress, to prosecute and conduct such suits, argument would seem to be unnecessary to prove his authority to dispose of these cases in the manner proposed in the respective motions under consideration, * * *."[2]

The Castell litigation was a suit under the 1917 Trading with the Enemy Act. Following a judgment for the plaintiff there was a settlement in which the Attorney General agreed to abandon his appeal and pay over the property in consideration of the Government retaining part of it on account of a tax claim against the plaintiff. Later the plaintiff, as here, challenged the right of the Attorney General to make the settlement and the latter's power to do so was upheld. In the New York v. New Jersey opinion the Attorney General was sustained in accepting on behalf of the Government different relief from that for which he had sued.

■ The power of Congress to specifically limit the authority of the Attorney General with reference to litigation in which the Government is a party is, of course, undeniable. The Federal Tort Claims Act is a late illustration of this. Under that Act the Attorney General's right to settle cases is subject to the approval of the district court. 62 Stat. 984, 28 U.S.C. § 2677. Similarly, violations of the Immigration Act cannot be compromised without the consent of the court and the reason for the compromise must be spread on the court minutes. 39 Stat. 893, 894, 8 U.S.C.A. § 164. But where such express restriction is not spelled out in a particular statute "* * * no Act of Congress has amended the statutes which impose on the Attorney General the authority and the duty to protect the Government's interests through the courts." United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 1663, 91 L.Ed. 1889. See also Swift & Co. v. United States, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587; Kern River Co. v. United States, 257 U.S. 147, 155, 42 S.Ct. 60, 66 L.Ed. 175.

The opinions of the Attorney General since 1831 uphold his authority to compromise Government litigation. Those opinions are quoted in the opinion of Attorney General Cummings of October 2, 1934, 38 Op.Attys.Gen. 98.

Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361, cited by plaintiffs as contrary authority, merely held that in the face of an express statute outlining the only method in which a tax controversy could be compromised, an attempt by a collector of internal revenue to settle that type of claim was of no effect. Botany Worsted Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379, is in the same general category. Nor are the Societe Suisse Cases, Cum-

---

2. And see United States v. San Jacinto Tin Co., 125 U.S. 273, 278–280, 284–285, 8 S.Ct. 850, 31 L.Ed. 747.

mings v. Societe Suisse Pour Valeurs De Metaux, 66 App.D.C. 121, 85 F.2d 287, 69 App.D.C. 154, 99 F.2d 387, certiorari denied 306 U.S. 631, 59 S.Ct. 463, 83 L.Ed. 1033, of any comfort to plaintiffs. While fraud was existent in both suits, the Court of Appeals in the second opinion stated that fraud was not necessary for the Government to prove if it showed that it had settled the claim involved out of court upon a mistake of fact, namely, that Swiss Corporation was the owner of the stock in question prior to the commencement of the First World War.

In arguing that neither the Attorney General nor the Alien Property Custodian possess authority under the Trading with the Enemy Act of 1917 to have entered into this settlement on behalf of the United States, plaintiffs are confronted with Section 5(b) of that statute as amended by Section 301 of Title III of the First War Powers Act, 1941. 55 Stat. 839, 50 U.S.C. Appendix, § 616. This reads:

"* * * and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, *used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States,* and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; * * *." (Emphasis supplied.)

The broad powers above outlined were conveyed to the Custodian by Executive Order 9193, July 6, 1942, 7 Fed. Reg. 5205, 50 U.S.C.A.Appendix, § 6 note. They are exemplified in the vesting order used in this matter which employed language appearing in all such orders until 1946 when that language was eliminated as unnecessary. The order read:

"Such property and any or all of the proceeds thereof shall be held in a spe-

cial account pending further determination of the Alien Property Custodian. This shall not be deemed to limit the powers of the Alien Property Custodian to return such property or the proceeds thereof, or to indicate that compensation will not be paid in lieu thereof, if and when it should be determined that such return or compensation should be made." ·

In the sole reported decision directly on the point the Custodian was sustained under this section in conveying vested property as part of a suit settlement. Standard Oil Co. v. Markham, D.C.S.D.N.Y., 64 F.Supp. 656, 666–667, mod. sub. nom. Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, 932, certiorari denied 333 U.S. 873, 68 S.Ct. 901, 92 L.Ed. 1149. In that matter too the Custodian was acting in cooperation with the Attorney General and the district court's holding that the Custodian and the Attorney General had the authority to transfer vested property was not disturbed. I think that decision is sound and applicable to the issue at bar.

Additionally as urged by the Government, this was in reality the return of the ascertained non-enemy interest in the stock in accordance with the terms of the vesting order above quoted. Finally as to Section 5(b) all of the briefs leave no room for doubt that the problem of the Halbach claim to the General Dyestuff stock was, in the language of the section, "* * * dealt with in the interest of and for the benefit of the United States, * * *" by the Attorney General and the Alien Property Custodian. (Emphasis supplied.)

Plaintiffs contend that the payment for their claim by the Custodian was in conflict with Section 12 of the Act. That section, reads:

"All moneys (including checks and drafts payable on demand) paid to or received by the alien property custodian pursuant to this Act shall be deposited forthwith in the Treasury of the United States, and may be invested and reinvested by the Secretary of the Treasury in United States bonds or United States certificates of indebted-

ness, under such rules and regulations as the President shall prescribe for such deposit, investment, and sale of securities; and as soon after the end of the war as the President shall deem practicable, such securities shall be sold and the proceeds deposited in the Treasury."

■ The end of the war referred to in the section is the end of World War I. On May 15, 1939 the President by Executive Order May 15, 1939, No. 8136, Section 4, 4 Fed. Reg. 2044, ordered the securities held by the Secretary of the Treasury sold and thus concluded the Secretary's obligation under Section 12 to invest, etc. I agree with the defense that if Section 12 limits what would be proper under 5(b) as presently worded, the latter section, which came into the Act as part of the First War Powers Act on December 18, 1941, would prevail.

■ The money used by the Custodian to pay the Halbachs was from his special account with the Treasurer of the United States which account had been set up in accordance with the mandate of the vesting order. But even if the money had been on deposit with the Treasurer there would not have been the slightest difficulty in arranging for the Halbach payment. Executive Order Feb. 26, 1918, No. 2813, Section 5(d) in effect on that date gave the Secretary of the Treasury the right to withdraw monies deposited in the Treasury under the Act " * * * for the purpose of making any payment or payments pursuant to the provisions of said Act, * * *." And the Attorney General had already held that the Secretary of the Treasury had the authority to pay out money for services to the Custodian, 31 Op. Attys. Gen. 438. It seems obvious that under the circumstances of this case if the funds used to pay the plaintiffs' claim had been on deposit with the Treasury, the Secretary thereof on request would have put them at the disposal of the Custodian for use in the settlement.

■ It is conceded that Section 12 does authorize the Custodian to return property under Section 9 of the Act upon the order of the President. That section has been construed as providing for the " * * * administrative consideration and allowance of claims to property transferred to the Custodian." McGrath v. Manufacturers Trust Co., 338 U.S. 241, 246, Note 8, 70 S.Ct. 4, 7, 94 L.Ed. 31. Plaintiffs say the section does not apply in this instance because it makes no provision for a compromise settlement and because the President did not delegate his power of return under the section to the Custodian. There is no merit to the second objection. By Executive Order 8136, May 15, 1939, 4 Fed. Reg. 2044, the President vested all of his powers under Sections 9, 12, 20 and 21 of the Act in the Attorney General or the Assistant Attorney General in charge of the claims division in the Department of Justice. Later, by Executive Order 9142, April 21, 1942, 50 U.S.C.A.Appendix § 6 note, he transferred that authority to the Custodian. Cf. Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165, concurring op. Mr. Justice Burton, 326 U.S. at pages 421, 423, 66 S.Ct. at pages 201, 202. As to plaintiffs' first objection the presentation of their claim followed by this suit was strictly under the requirements of Section 9(a) of the Act. The foundation of the settlement from the standpoint of the Custodian was the return of the calculated non-enemy interest in the stock with the Custodian for the United States retaining the enemy interest. Plaintiffs might disagree with the amount arrived at by the Custodian and with his construction of the option but the record reveals that he had substantial grounds for his conclusion that $118 a share fairly represented the non-enemy value of the shares and it was at that rate he settled the plaintiffs' claim. I think the transaction came well within Section 9(a) reasonably interpreted.

Under the facts and law the settlement of this litigation was properly entered into and carried to a conclusion by the Attorney General and the Alien Property Custodian representing the United States. It should not be set aside.

The motion will be denied with costs in favor of the defendant.