UEBERSEE FINANZ–KORPORATION, A.G., Liestal, Switzerland, Plaintiff, Fritz von Opel, Intervener-Plaintiff,

v.

Herbert BROWNELL, Jr., Attorney General and as Successor to the Alien Property Custodian, Defendant,

Frima Trust Establishment of Vaduz, Liechtenstein, Hans Frankenberg, Eugen Meier and Adolf Gaeng, Intervener-Defendants.

Civ. A. No. 26453.

United States District Court
District of Columbia.

June 17, 1955.

LAWS, Chief Judge.

In this suit intervener plaintiff seeks to recover an interest in property vested by the Alien Property Custodian in 1942 under provisions of the Trading with the Enemy Act of 1917, 40 Stat. 411, as amended by the First War Powers Act of 1941, 55 Stat. 839, 50 U.S.C.A. Appendix, § 5(b). At a former trial, in which plaintiff Uebersee sought to recover the property itself, this Court found that the enemy taint of plaintiff barred recovery. Uebersee Finanz-Korporation, A. G. v. Clark, D.C., 82 F.Supp. 602. Judgment was affirmed by the United States Court of Appeals for the District of Columbia Circuit, Uebersee Finanz-Korporation, A. G. v. McGrath, 89 U.S.App.D.C. 167, 196 F.2d 557, and by the Supreme Court of the United States, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888. The same day the Supreme Court decided plaintiff's case, it also decided in another case that when the Government seizes assets of a corporation organized under the laws of a neutral country, the rights of innocent stockholders to an interest in the assets proportionate to their stockholdings must be fully protected. Kaufman v. Societe Internationale Pour Participations Industrielles et Commerciales, S.A., 1952, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853. The Supreme Court accordingly remanded this case for consideration of any application that might be made on behalf of intervener plaintiff Fritz von Opel, the legal owner of 97% of the corporation's stock.

At the instance of the parties, the Court before trial ruled on several motions pertaining to the scope of inquiry at this trial. It held that its previous findings and conclusions entered at the trial of plaintiff's case would control in the present suit as to all issues framed, without prejudice to the right of either party to offer additional evidence supplemental to, but not contradictory of, such determinations. D.C., 121 F.Supp. 420. It also held that the interest recoverable, if any, must be determined by the law of Germany, where Fritz von Opel

Edward J. Ennis, Arnold, Fortas & Porter, Thurman Arnold, Walter E. Gallagher, Washington, D. C., for plaintiff and interveners.

Dallas S. Townsend, Asst. Atty. Gen., James D. Hill, Walter T. Nolte, and Myron C. Baum, Washington, D. C., for defendant.

obtained legal title to plaintiff corporation under a gift agreement, rather than the law of Switzerland, where plaintiff was incorporated. D.C., 127 F.Supp. 42.

In ruling on the question of *res judicata*, 121 F.Supp. 420, the Court determined the issues in this trial to be as follows: (1) enemy status; (2) enemy taint; and (3) the value of Fritz von Opel's severable interest.

### I. Enemy Status

Enemy status is defined by Section 2 of the Trading with the Enemy Act of 1917, which provides, so far as pertinent to this suit:

> "The word 'enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—

> "(a) Any individual * * *, of any nationality, resident within the territory * * * of any nation with which the United States is at war, or resident outside the United States and doing business within such territory * * *" 50 U.S.C. A.Appendix, § 2.

Residence or doing business in a hostile territory, and not nationality, is the test of enemy status. Section 39 of the Act provides:

> "No property or interest therein of Germany, Japan, or any national of either such country vested in or transferred to any officer or agency of the Government * * * shall be returned to former owners thereof or their successors in interest * * *." 50 U.S.C.A.Appendix, § 39.

As interpreted by the Supreme Court, Section 39 applies only to those German nationals who are also "enemies" under the Act. Guessefeldt v. McGrath, 1952, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342.

Fritz von Opel was not a resident within enemy territory under the first part of Section 2(a). As this Court found at the first trial, he never resided in Germany after December, 1929, but lived successively in the United States, Belgium and Switzerland; in 1934 he became a Swiss domiciliary. The question under enemy status is therefore whether he was a "resident outside the United States and doing business within such [hostile] territory".

The evidence as to residence is that Fritz von Opel entered the United States in May, 1940, on a six months' visitor's visa to attend to his investments in this country. The visa was extended for additional periods of six months at a time until February, 1942, shortly after the United States entered the war, when he was interned. He remained in custody until the end of the war, and was permitted to depart voluntarily in 1950. He was never admitted to the United States for permanent residence. There is no indication that he established any abode in this country. He stayed variously in New York, New Jersey, Miami Beach and Palm Beach, Florida, and elsewhere in the South before he was interned. The period of his internment is without significance, since involuntary detention or physical constraint does not constitute residence within the meaning of the Act. Guessefeldt v. McGrath, supra, and cases cited.

In connection with the question of residence, the Court will consider what were Fritz von Opel's activities, associations, statements, ties and sympathies as throwing light on where the family hearth was centered. See District of Columbia v. Murphy, 1941, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329; Kristensen v. McGrath, 1949, 86 U.S.App.D.C. 48, 179 F.2d 796, affirmed 340 U.S. 162, 71 S.Ct. 224, 95 L.Ed. 173; McGrath v. Zander, 1949, 85 U.S.App.D.C. 334, 177 F.2d 649; Stadtmuller v. Miller, 2 Cir., 1926, 11 F.2d 732, 45 A.L.R. 895; Ruoff v. Brownell, D.C.D.C.1953, 14 F.R.D. 371. Although a native of Germany, by establishing his domicile in Switzerland he had been able to avoid German foreign exchange restrictions. Between December, 1930, and August, 1939, he went to Germany for short visits totalling about ten per cent of the time, principally in connection with his father's financial in-

vestments and to participate in sporting events. When war came to Europe in September, 1939, he undertook negotiations to acquire neutral citizenship. In November, 1939, he became a naturalized citizen of Liechtenstein upon payment of approximately $10,000, although the only time he had ever been there was when he was traveling through it. He never took an oath of allegiance to the principality. Statements made and acts performed by him after he was naturalized indicate a continued interest in the welfare of and sympathy for Germany. This Court previously found such attachment to and sympathy for Germany in deciding the question of Uebersee's enemy taint. Fritz von Opel's naturalization by Liechtenstein clearly appears to have been a citizenship of convenience. There was no more attachment, patriotism, sentiment, interest or loyalty to this principality than there was to Haiti or Panama, whose citizenship he had earlier considered acquiring.

Evidence was adduced that Fritz von Opel was not a vigorous supporter of the National Socialist regime in Germany, insofar as it conflicted with his concern to protect his financial investments and his personal safety. While he had been a non-commissioned officer of the German Army at the end of the First World War, he was able to avoid military service in the Second World War. He resented fines levied upon his father and upon his sister for violation of currency regulations. However, there was also evidence that he was friendly socially with persons prominent in the German Government and that he took pride in the prowess of the German Army and extended his aid to the German Government in the early days of the Second World War. There is no showing that his leaving Switzerland was other than temporary, that his ties remained elsewhere than in Switzerland and Germany, that such interest as he had in the United States was other than financial or that any bonds of affection or sentiment attached him to the United States.

The Court finds that since Fritz von Opel was merely present in this country during the war as a visitor, transient or sojourner, with no fixed or settled abode in this country, he was not a resident of the United States within the meaning of the Trading with the Enemy Act. Guessefeldt v. McGrath, supra.

Defendant introduced evidence to prove that after. December 13, 1941, Fritz von Opel did business in Hungary, then an enemy, through an agent to whom he had delegated powers of attorney. At the first trial of the case, the Court found that Uebersee owned all the stock of Transdanubia Bauxite, A.G., a Hungarian corporation engaged in mining bauxite, an essential ingredient in the production of aluminum. Uebersee in 1939 and 1940 had guaranteed a loan by a Swiss bank to Transdanubia which was repaid in November, 1942. In November, 1939, after war broke out in Europe, Fritz von Opel went to Hungary to speed the production of bauxite in response to a request from Giulini Bros. of Germany to "do meritorious service for the raw material supply of the German aluminum industry and the entire war economy of Germany * * *." During October, November and December, 1941, Transdanubia shipped bauxite to Germany under a contract extending to the end of 1942.

Evidence was received that Fritz von Opel actively managed and directed the policies and affairs of Transdanubia. In addition to trips to Hungary between 1935 and 1939, he appointed a Dr. Salusinszky, of Budapest, Hungary, to manage Transdanubia's affairs and keep him informed as to operations and legal matters. After the death of Dr. Salusinszky in 1939, upon request von Opel gave to a Dr. Timar powers of attorney theretofore exercised by Dr. Salusinszky in dealing with individuals as well as public authorities and signing his name for Transdanubia. Dr. Timar thereafter acted in the same capacity as had Dr. Salusinszky. After an agreement with

Giulini Bros. in 1940, a joint representative was made responsible to the Hungarian Government for the operations.

Transdanubia shipped bauxite to Germany during December, 1941, at or about the same time the United States was at war with Germany and Hungary. It is a fair inference it continued to supply war materials to the enemy during the war, since the contract called for production until the end of 1942. Transdanubia was able to pay off its loan in November, 1942. There is no indication that the operations were thereafter abandoned or that Uebersee ever took affirmative steps to sever its relations with Transdanubia. There is likewise no evidence that the powers of attorney granted to Dr. Timar were revoked.

█ Contributing to the resources of the enemy through supervising and encouraging the production of essential war materials in one enemy country, for shipment to another enemy country, constitutes the doing of business in enemy territory within the meaning of Section 2(a) of the Act. The activities of Dr. Timar as agent under powers of attorney given him by Fritz von Opel are attributable to the latter. Fritz von Opel's personal participation in spurring the production of bauxite after the outbreak of war in Europe, his close relation to the activities of Transdanubia, and his strong personal interest in the welfare of the corporation make his relationship to Transdanubia more direct than those of Uebersee and his father in whose interest he was acting.

█ Fritz von Opel argues that the availability of criminal sanctions for trading with the enemy under Section 3 of the Act indicates it was never intended that the seizure provisions should reach the property of persons within the United States during time of war, whether or not a resident. The power and the purposes of the Government to vest and hold property of an enemy are different in character from those of the criminal law and obviously

are not to be affected by provisions relating to crime.

██ It is maintained that to deny Fritz von Opel recovery would be a taking of property without just compensation and a denial of due process of law. The answer to this contention is that friendly aliens are protected by the Fifth Amendment requirement of just compensation, Guessefeldt v. McGrath, supra; Silesian-American Corp. v. Clark, 1947, 332 U.S. 469, 68 S.Ct. 179, 92 L. Ed. 81; Russian Volunteer Fleet v. United States, 1931, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473, but the United States, under the power to wage war and make rules concerning captures on land and water, may confiscate enemy properties, Silesian-American Corp. v. Clark, supra; United States v. Chemical Foundation, 1926, 272 U.S. 1, 47 S. Ct. 1, 71 L.Ed. 131; Miller v. United States, 1871, 11 Wall. 268; 20 L.Ed. 135. Due process is preserved by the provisions of Section 9(a) authorizing suit for recovery by any person not an enemy or ally of an enemy. Cummings v. Deutsche Bank Und Discontogesellschaft, 1937, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545; Stoehr v. Wallace, 1921, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604.

█ From the evidence the Court finds that Fritz von Opel was an enemy under Section 2(a) of the Act and must be denied recovery because he was a resident outside the United States and doing business within enemy territory.

## II. Enemy Taint

█ The adoption of the 1941 amendment to Section 5(b) of the Act as interpreted by the Supreme Court in the first Uebersee opinion, Clark v. Uebersee Finanz-Korporation, A.G., 1947, 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88, added to enemy status the concept of enemy taint as a bar to recovery. The 1941 amendment authorized the seizure and vesting of "any property or interest of any foreign country or national thereof", but left unchanged the definition of

"enemy" under Section 2 and the right of "Any person not an enemy or ally of enemy" to sue for recovery under Section 9(a). The Supreme Court construed the definitions of Section 2 as merely illustrative, not exclusionary, so as to reach enemy interests masquerading under friendly or neutral fronts, but not bar recovery by foreign interests having no possible connection with the enemy. Under the second Uebersee opinion, in Uebersee Finanz-Korporation, A.G. v. McGrath, 1952, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888, enemy taint may exist in a corporation organized under the laws of a neutral country as to bar recovery if it is under the direct or indirect control and domination of an enemy national. At the same time, in the Kaufman opinion, supra, the Court gave protection to the right of an innocent individual stockholder to recover the proportionate share of his holdings in such a corporation.

It is Fritz von Opel's contention that the doctrine of enemy taint is restricted to ostensibly neutral corporations owned, directed or controlled by enemy nationals, and may not be extended to individual stockholders. Such a restrictive reading of the amendment of 1941 is unwarranted. The Supreme Court made clear in the first Uebersee opinion the primary concern of the Congress in amending Section 5(b) was the inability of the Act of 1917 to deal effectively with the numerous techniques and devices which had been developed to cloak and conceal enemy ownership or control of property ostensibly friendly or neutral. Because Section 2 was too rigid and inflexible to cope with the new methods of waging economic warfare against the United States, new flexible powers were made available adapted to searching out enemy interests in whatever form they might assume.

The legislation should be construed to effectuate the purposes intended. To hold that the United States may pierce the corporate veil to determine whether enemy taint exists, but may not inquire whether individuals outside the definitions of Section 2 are giving aid or comfort to the enemy, acting in their behalf, contributing to their resources, or otherwise threatening the nation's security, would frustrate the intent of Congress.

Because of the various means of cloaking and concealment operations which may be attempted, no definition of enemy taint can be sufficiently inclusive to reach all enemy interests masquerading as friendly or neutral. The Court must look to the particular facts and circumstances of each case to determine whether an individual claimant is infected with enemy taint.

In this case, Fritz von Opel holds bare legal title to 97% of the shares of plaintiff, an enemy-tainted corporation, formerly the owner of the property vested by the Custodian. Through a gift agreement executed in Germany in 1931, his parents, enemies under the Act, retained certain rights as usufructuaries under German law. In practice, their interests extended far beyond the usual incidents of a usufruct. As stated by the Supreme Court in the second Uebersee opinion, supra, the property was largely owned, managed, used, controlled, and in all ways handled and directed by Wilhelm von Opel, the father, and his managing agent. Wilhelm was able to control and use his property as he saw fit. His interest was paramount and controlling. The interest of Fritz von Opel was wholly and in reality subordinated to that of his father, except as to the right of Fritz to receive 20% of the income from the usufruct property. Even this right was not independent, as the claim of a stockholder against his corporation, but, as declared by the United States Court of Appeals for the District of Columbia Circuit on appeal from the first trial, was a contract claim against his enemy parents.

With respect to the property claimed in this suit, it appears Fritz von Opel was a means of protecting the interests of enemy nationals in this enemy-tainted corporation. Except for the vesting of the property by the Custodian, through him enemy nationals would be able to claim and receive all the proceeds and benefits of the property ostensibly in his

name. Through him enemy nationals might have available dollar exchange and other financial resources for use by the enemy in economic warfare against the United States. This the Act was intended to prevent. As stated by the United States Court of Appeals for the Second Circuit, in distinguishing between persons aiding the enemy and those compelled to remain in enemy territory during hostilities:

> "The Trading with the Enemy Act no doubt was founded upon the public policy which forbids 'the doing of acts that may be to the advantage of the enemy state by increasing its capacity for prolonging hostilities, in adding to the credit, money or goods, or other resources valuable to individuals in the enemy state.' We concede that the intention was to make it impossible to aid the enemy (Germany) by forbidding that money or property of any kind held in the United States should reach the hands of the enemy. The intention was to make it impossible for a dollar to inure to the advantage of Germany." Stadtmuller v. Miller, supra, 11 F.2d at pages 733–734.

■ Enemy influence and benefit permeate the interest of Fritz von Opel. Fritz von Opel is not in a position to assert, like plaintiff interveners in Kaufman v. Societe Internationale, etc., supra, that he is a mere innocent investor in an ostensibly neutral corporation, with interests hostile to the dominant enemy management, without knowledge the assets in his name were contributing to the resources of enemy nationals. The Court finds that since Fritz von Opel holds his interests in plaintiff enemy-tainted corporation primarily on behalf and for the benefit of enemy nationals, such interests are enemy tainted and may not be recovered by him.

The second subject of inquiry on the question of enemy taint is the activities of Fritz von Opel as an alleged agent of the enemy and enemy nationals. The evidence at the first trial shows his activities to a large degree were carried on with the guidance and under the direction of his father, Wilhelm von Opel, or his father's agent, Hans Frankenberg. The Supreme Court said, 343 U.S. at pages 210, 211, 72 S.Ct. at page 620: "The interest of Fritz [von Opel] in petitioner [Uebersee] was wholly subordinated to that of Wilhelm"; such right as the bare legal title gave to him, "he exercised or failed to exercise in complete subordination to the will of his father."

At the second trial additional evidence was introduced concerning Fritz von Opel's activities as representative and agent of his father. As a member of the board of directors of Collet & Engelhard, a German machine tool manufacturing company in which Wilhelm von Opel owned more than 60% of the stock, Fritz von Opel who owned no stock supervised and controlled business activities, policies and management, including production, expansion and personnel. Similar functions were exercised by him in the Machine Factory Weisbaden, a corporation wholly owned by Collet & Engelhard which produced radiators, cranes and other steel products, although he was neither an officer, director or stockholder.

With his sister Fritz von Opel was a member of his father's Property Administration Company, organized to hold Wilhelm von Opel's assets, in which Wilhelm von Opel was manager for life and the members could not claim any distribution of profits. Fritz von Opel was active in the supervision and management of his father's Forest Administration Company, which was held by the Property Administration Company and consisted of a German forest estate for cutting timber and raising fish and animals, and conducted litigation on its behalf. He consulted with his father on the latter's substantial investments in the banking house of the Union Bank of Darmstadt and Berlin, and acted for his father in later bankruptcy proceedings. He was active and influential in persuading his father to shift his investments from fixed obligations in marks to tangi-

ble properties whose monetary values would rise in step with any inflation that might occur.

These activities show Fritz von Opel was continually acting for and on behalf of and as an agent of his father. Whether because of filial devotion or his position as heir apparent with his sister to his father's large fortune, it was only natural that he should do so. There is no evidence that the close working relationship or attachment between father and son was ever severed or altered, or that their positions became adverse.

There is also evidence as to activities of Fritz von Opel after the outbreak of war in Europe, when there could no longer be any doubt of the nature of the German regime. There is, first, the evidence of the circumstances of his acquisition of Liechtenstein citizenship, indicating not merely his loyalty to Germany in the abstract but also his allegiance to the existing form of government in power. The primary object of the 1931 gift agreement had been to avoid German foreign exchange restrictions by placing legal title in Fritz von Opel, a non-resident of Germany. When war came to Europe in September, 1939, it became apparent this was not sufficient to protect the American assets of Uebersee against seizure in the event the United States entered the war, since he was still a citizen of Germany although domiciled in Switzerland. In negotiations with the German Government to drop his German citizenship for the duration of the war, he wrote on October 29, 1939, to Hans Siegismund von Bibra, Counselor of the German Legation in Berne, Switzerland, and leader of the German Nazi Party in Switzerland, as follows:

" * * * The danger of seizure of German foreign assets through the possible entry of the U.S.A. into the war has become imminent. * *

"While I hope to be able to obtain a release from the British authorities (by reason of the fact that the plantation is owned by a Swiss corporation with exclusively Swiss stockholders) my lawyers are unanimously of the opinion that the safeguarding and cloaking [i.e. "smokescreen" or "some kind of hiding"] measures taken will certainly not hold up for any length of time vis-a-vis the very thoroughly informed *American* authorities and that a seizure can be avoided only by my taking timely precautions which would permit me to acquire a neutral citizenship in an emergency.

"In explanation I would like to note the following: although—as mentioned previously—I have been active in business in America for 10 years and could have been an American citizen for the past half decade, it has gone against my grain for various reasons to relinquish my German citizenship which to me is the tangible expression of my ties to my homeland * * *." (Emphasis in original.)

As a result of the negotiations, von Bibra replied by letter dated November 20, 1939:

"First of all I would like to inform you that I have ascertained from the documents which you have submitted to me that you had the question examined in Germany under what conditions you may temporarily assume a third citizenship in order to preserve the substantial assets in the United States in the German interest. * * *

"Since you have unequivocally declared that you will relinquish German citizenship only for the purpose of preserving for the German Reich your substantial assets in the event that America enters the war, and since moreover you have reported here immediately after the outbreak of the war and have offered your services for any activity of whatever kind, there should in our opinion be no difficulties in reinstating you in your German citizenship after the termination of the war. A notation to that effect concerning this matter is in the files of the Legation."

The explanation offered by Fritz von Opel is that these letters were a sham designed by himself and von Bibra to deceive the German Government into permitting him to escape military service and flee from the German authorities to the United States. It is impossible to believe that a person occupying the high position in the Nazi party as did von Bibra, in a post so sensitive as that of Switzerland and later Madrid, would have attempted to deceive his Government. Certainly he would not act in this matter for Fritz von Opel, who came to him as a stranger, immediately upon discovery von Bibra's wife was a friend and former neighbor of Mrs. von Opel's aunt. If von Bibra's letter was a deception, it would not have been written by a subordinate in the legation as indicated by von Bibra's testimony. It is impossible to believe Fritz von Opel's claim that the acquisition of Liechtenstein citizenship was intended to deceive the German authorities and not those of Great Britain and America.

A second indication of Fritz von Opel's relation to and cooperation with the German Government is his suggestion to von Bibra of the name of a Dr. Wehrli, head of the Wehrli-Bank in Zurich ("* * * if properly approached he would probably consent to hold himself at our disposal * * * ") in response to a secret telegram from Berlin to the German legation at Berne on September 1, 1939, requesting the names of "trustworthy, reliable Swiss persons" who could be named as payees for checks, sight drafts and sight bills so that foreign exchange could be made available to the German Government.

The Court has previously noted a third indication of cooperation with Germany through the active efforts of Fritz von Opel to speed up the production of bauxite by Transdanubia for shipment to Germany for the making of aluminum.

A fourth indication is Fritz von Opel's negotiations on behalf of his father through the German Consulate in New York City after he had come to the United States less than ten months before the attack on Pearl Harbor. In February, 1941, he was advised by the Commercial Attache of that Consulate of a confidential telegram from his father received through diplomatic channels and that the Consulate wished to speak to him about the contents. Fritz von Opel by letter dated February 13, 1941, said he was unable to come, but would send Mrs. von Opel, and told the Commercial Attache: "Your involvement in this matter is apparently due to the fact that it is impossible to send telegrams, even those dealing with business matters, from Germany to private addresses, and I wish therefore to express to you my special thanks for your very kind efforts." Mrs. von Opel was informed at the Consulate that Wilhelm von Opel wished his son Fritz to negotiate with the General Motors Corporation concerning a possible repurchase of the stock of Adam Opel, A.G., which had been purchased by General Motors in 1929 and 1931. On February 13, 1941, Fritz wrote the Commercial Attache that he was willing to take part in these negotiations, but that his attorneys had advised him it would then be necessary to register as an agent of a foreign government, and said:

"* * * I have decided to withdraw from even social contacts of any kind with other industrialists, and especially with the gentlemen of General Motors, and to visit only such places where my presence is plausible and absolutely necessary by reason of my business interests which are sufficiently known in Washington. I am convinced that you will understand and approve of my endeavor to avoid unnecessary tensions; this is in the interest of all non-Americans living and working here and especially in the interest of German-American relations which unfortunately are already seriously impaired. From all these considerations you will also understand that it would by no means be easy for me to accept the proposition of my father, for my being registered as a so-called agent would lead

to the most unpleasant complications in case of a war."

Fritz von Opel wrote that he suggested nevertheless that a telegram be sent his father that he was ready to conduct negotiations, but must formally notify the authorities in the United States by reason of applicable legal provisions. After sending the letter, he went to see the General Counsel of the General Motors Corporation to find out whether General Motors was interested in selling the stock.

Fritz von Opel contends that he contributed to the war effort of the United States through inventions and information furnished the interrogation officer while he was held in internment. The Court finds the record before the Court fails to support these contentions.

The Court agrees with counsel for Fritz von Opel that his sympathies and attachments do not constitute "enemy taint". They have been considered only as bearing upon his activities in promoting enemy interests, and as bearing upon his residence.

 Fritz von Opel claims that defendant's allegations he is an agent of the enemy and enemy nationals and that he was doing business within enemy territory are new issues outside of the pre-trial statement and may not now be raised. In his own pre-trial statement, he contended he did not do business within enemy territory, and that as a stockholder he did not act for the enemy but, on the contrary, was opposed to the German war aims and aided the United States war effort. Defendant's pre-trial memorandum states the question, as does the Court's opinion on *res judicata*, 121 F.Supp. 420, as whether Fritz von Opel is innocent of enemy status or enemy taint, and, therefore, eligible to recover the property in this suit. The evidence produced was known to the claimant before trial, some of the documents having been produced by him through discovery procedures. The inferences defendant would seek to draw from the evidence appear to be plain. He testified on many activities, including those on behalf of his father and Transdanubia, and the letters between von Bibra and himself, on direct examination. It appears he knew, or should have known, that the full range of his business activities within enemy territory would be explored.

 The Court finds that Fritz von Opel acted for and on behalf of and as an agent of the enemy and enemy nationals, and that such activities constitute enemy taint and bar recovery.

### III. The Value of Fritz von Opel's Severable Interest

Although the Court has concluded Fritz von Opel is barred from recovery, it will enter findings and conclusions under German law as to the value of his several interest in order to avoid necessity to make such findings in the event its views are not sustained on appeal. The Court will consider: (1) any rights as title holder; (2) rights of survivorship; and (3) a right to receive 20% of the dividends and interest from the property.

The legal title holder retains the rights in the property which have not been bestowed upon the usufructuaries or reserved by them if the donors. At the first trial, the Court made findings with respect to the *in rem* rights of the usufructuaries under German law to the enjoyment of the property or income, to co-possession, to a voice in the management, to prevent sale or disposition, and to vote. Fritz von Opel has introduced further evidence on German law as to the duties of the usufructuaries with respect to use, accounting, preservation and repair of the res, payment of insurance and public charges, and similar matters. He argues he is entitled to all the rights of an owner of property except those rights given to a usufructuary under the German Civil Code.

This Court, however, in its findings at the first trial went beyond examination of the usual incidents of a German usufruct to determine the respective interests of parents and son. It found that "the usufructuary *and other interests* of Wilhelm and Marta von Opel in the

stock" and securities barred recovery by Uebersee. 82 F.Supp. at page 605. Hans Frankenberg, as agent for Wilhelm von Opel, exercised control over the major policies, investments and activities of Uebersee from 1932 up to the date of vesting; the activities of Fritz to a large degree were carried on with the guidance and direction of his father or his father's agent. These findings were approved on appeal.

Additional evidence introduced at this trial shows that a usufruct is a highly personal, non-transferable right which terminates by operation of law with the deaths of the usufructuaries. Under German law, it is appropriate that the Court consider not only the interests flowing from the usual incidents of a usufruct, but also the beneficial or economic ownership of property. In this case during the existence of the usufruct the beneficial interests were so dominant that the interests of Fritz von Opel as legal owner were without value.

Based upon this consideration of economic ownership, defendant argues that Fritz von Opel has no interest in the property which he could recover even if innocent of enemy status and enemy taint. Such interest as he had, it is argued, was the mere contingent hope or expectancy of a prospective heir, a future interest which was cut off by the vesting of the property by the Custodian. The evidence shows that the survivorship rights of Fritz von Opel were more than this. The gift agreement was not intended to be a sham transaction, but had, in addition to protection of the investment, a purpose of making financial provision for Fritz von Opel. It sought to do this by giving him a right to receive 20% of the income and dividends, and the whole of the estate subject to the life interest of the usufructuaries. That the donors, his parents, intended this be a vested remainder is further indicated by the conditions subsequent attached to the gift, that the transfer was to revert to the parents if Fritz von Opel died before them without legitimate issue, but was to be considered as an advancement on the parents' estate if he survived them.

Defendant argues Fritz von Opel has no recoverable interest because Wilhelm von Opel could use the property as he saw fit with full and uncontrolled power of disposition of the property, so that Fritz von Opel had no assurance or guarantee that any property at all would be left to pass to him upon death of his parents. While the evidence is inconclusive as to Wilhelm von Opel's power of disposition, there is evidence that an oil lease owned by American corporations whose stock was purchased with the proceeds from sale of Adam Opel shares was sold to pay a fine imposed on Wilhelm in Germany, that expenses of trips by Wilhelm to South America and Hungary were paid by Uebersee and charged against the income account of Fritz von Opel, and that a proposal was made by Wilhelm to sell shares of some of the stock owned by Uebersee against the wishes of Fritz.

Assuming Wilhelm's power of disposition was unlimited, this does not necessarily mean the interest of the son would be without value. During the life of the usufruct, as indicated by the two decisions of the Supreme Tax Court of Germany cited by defendant, the usufructuary is considered under German law as holding the full ownership of the property for income tax purposes if he has sole possession, control and power of disposition. Since he receives the full benefit and enjoyment of the property, the levy of an annual property tax naturally would fall upon him. This power does not, however, destroy the rights of the legal owner. Under the usual usufruct agreement, he is entitled to the return of the res when the usufruct is extinguished. When the usufructuary has in addition the power of disposition, the legal owner receives the property that remains at termination of the usufruct. Although the property may be dissipated or disposed of during the life of the usufruct, so long as some property remains or the proceeds of the original

property may be ascertained it is clear the legal owner has a present interest in the property subject to prior disposition.

 The expert witnesses agree there is no German law indicating the apportionment that should be made during the life of the usufruct of the entire interests of the usufructuary and legal owner. This is so because a usufruct may be terminated before its natural end only by agreement of the parties, who would also agree on the division. However, it was testified and the Court finds that a German Court would follow sound principles of accounting, would take into consideration the intention of the parties, and would compute the interests by analogy to the method of ascertaining the capital value of annuities and other life-long interests and benefits. Pursuant to German law, Fritz von Opel's interest would be established according to life expectancy tables as applied to the parents and the estimated income to be derived from the property during their lives. Since the critical date for determining whether property is enemy-held is the date of declaration of war, Societe Suisse Pour Valeurs de Metaux v. Cummings, 1938, 69 App.D.C. 154, 99 F.2d 387, certiorari denied, Societe Suisse Pour Valeurs de Metaux v. Murphy, 306 U.S. 631, 59 S.Ct. 463, 83 L.Ed. 1033; Schrijver v. Sutherland, 1927, 57 App. D.C. 214, 19 F.2d 688, certiorari denied 275 U.S. 546, 48 S.Ct. 84, 72 L.Ed. 418, this date must govern in determining the respective enemy and non-enemy interests in the property.

 As to the right to receive 20% of the dividends and interest from the property, Fritz von Opel would have no claim for recovery. To the specific inquiry of plaintiff for interpretation of this clause in the gift agreement, the United States Court of Appeals for the District of Columbia on a motion for reconsideration said, 89 U.S.App.D.C. at page 170, 196 F.2d at page 560:

"That provision is perfectly clear. No part of the usufruct in the shares was assigned to Fritz von Opel. The whole of the usufruct remained with Wilhelm and his wife. Fritz von Opel was given a contract right to receive from Wilhelm and his wife 20 per cent of the dividends and interest received by them. This right in Fritz was a contract right and not a right *in rem*."

This finding is binding on the Court. Fritz von Opel concedes that he may not recover if his right to the 20% income is found to be a mere contract claim. It having been so found, this right is without value.

An order will be entered denying recovery to intervener plaintiff. Counsel will submit appropriate findings of fact and conclusions of law in conformity with this opinion.