## THE ANTOINETTA.

District Court, E. D. Pennsylvania.
March 8, 1943.

A. Matt. Werner, Gen. Counsel to Alien Property Custodian, George A. McNulty, Chief, Alien Property Unit, and Albert Parker, Atty., Alien Property Unit, all of Washington, D. C., for petitioner.

Homer L. Loomis (of Loomis & Williams), of New York City, for claimant.

KALODNER, District Judge.

Acting on the contention that the vessel "Antoinetta" (documented under the laws of the Government of Italy and Italian-owned) had been sabotaged while in the territorial waters of the United States, and further that the vessel had been used as a place of resort by persons conspiring to commit offenses against the United States, the United States of America on July 14, 1941, filed its libel seeking to declare the forfeiture of the "Antoinetta".

Subsequently, on July 31, 1941, one Giovanni Lena, master of the vessel, filed formal claim to it, intervening for the interests of Giuseppe Bozzo Fu Lorenzo (of Genoa, Italy) her alleged owner. On September 11, 1941, the claimant filed exceptions to the libel.

On September 29, 1941, the vessel was requisitioned for the United States Maritime Commission, under the Act of June 6, 1941.[1]

On October 8, 1941, this Court, acting on the petition of the United States of America, entered its order directing delivery of the "Antoinetta" by the United States Marshal to the United States Maritime Commission.

On July 29, 1942, Leo T. Crowley, Alien Property Custodian of the United States,[2] filed his petition setting forth:

(1) That following the declaration of a state of war between the United States of America and the Government of Italy[3] the claimant became and continues to be an enemy, as defined in Sec. 2 of the Trading With The Enemy Act of October 6, 1917, 50 U.S.C.A.Appendix § 2;

(2) That on July 22, 1942, the Alien Property Custodian, by a certain vesting order No. 52 (7 Fed.Reg. 5738) had demanded and seized and declared vested in himself all right, title, and interest, if any, of claimant in the vessel, to be held, used, etc., or otherwise dealt with, in the interest of and for the benefit of the United States; and

(3) That by virtue of the foregoing there has been effected a complete substitution of the petition for the claimant in respect of the claimant's rights, if any he had.

Accordingly, the petition of the Custodian prayed that an order be entered by this Court, substituting the custodian as a party to the forfeiture action in place of the claimant, and further that the claimant be adjudged without any right in the vessel and that all claims, pleadings, motions or exceptions filed by the claimant be dismissed as to the claimant but without prejudice to the petitioner, and that such rights as the claimant may have had prior to the vesting order be vested in the custodian, and all his claims, pleadings, etc., be ordered to stand for the benefit of the petitioner.

On September 19, 1942, the claimant filed an answer to the petition of the Custodian, denying no material allegations and admitting that the claimant was an enemy alien. On the same date the claimant filed notice of

(1) Motion to dismiss the petition of the Alien Property Custodian; and

(2) Motion to dismiss the original libel of the United States of America.

In addition, the claimant asks that the trial of the matter set forth in the libel for forfeiture be stayed until the end of the war between the belligerent countries.

The issues presented by the petition of the Alien Property Custodian, and the motion of the claimant to dismiss, are virtually identical with those ruled upon in The Pietro Campanella v. The Euro, D. C., 47 F.Supp. 374.

In those cases the court ruled (47 F. Supp. at page 377): "The vesting order of the Alien Property Custodian of July 22, 1942, has the legal effect of transferring completely to the Custodian for the benefit of the United States, the property interests of the claimants in the vessels as they then existed * * *."

The court, however, declined to make an order substituting the Custodian in place of the claimants and excluding them from defending the libels for forfeiture. The court also stayed all proceedings during the continuance of the war.

■ I am in accord with the ruling that the vesting order of the Custodian has the legal effect of transferring completely to the Custodian, for the benefit of the United States, the property interests of the claimants.

■ However, I am not in accord with the refusal of the court to grant that portion of the Custodian's petition seeking substitution of the Custodian as the party to the forfeiture action in place of the claimants, nor am I in accord with the order granting a stay of proceedings to the claimant.

Since the vesting order of the Custodian has the legal effect of transferring com-

---

[1] Public Law 101—77th Congress, c. 174, 55 Stat. 242–245, 46 U.S.C.A. note preceding section 1101.

[2] Executive Order No. 9095, as amended by Executive Order No. 9193 of July 6, 1942, 50 U.S.C.A. Appendix, § 6 note, 7 Fed.Reg. 5205, 5206.

[3] Resolution Dec. 11, 1941, c. 565, 55 Stat. 797, 50 U.S.C.A. Appendix note preceding section 1.

pletely to the Custodian the property interests of the claimant, and since a claimant's right to defend the original libel for forfeiture can only rest upon his claim to the libeled property, the substitution of the Custodian for the claimant in the forfeiture proceedings is an inevitable sequalae. With the transfer to the Custodian of his property interest in the vessel, the claimant stands denuded of all interest in the vessel and the right to possess it. The right of the claimant to possession of the seized vessel (in an in rem proceeding) is the sole basis of the claimant's right to defend as against the whole libel.

Within the rules of admiralty practice a "claimant" is one who demands possession of the res which has been seized in an in rem proceeding. As was stated in The Cartona, 2 Cir., 297 F. 827, 828:

"The right of answering in denial or avoidance of the libel, and all of it, in a suit in rem in the admiralty, depends upon the right to claim. No one can answer unless he has put himself in the position of a claimant, and the right to claim may itself be tested in limine by the libelant.

"The claimant in admiralty may defend in rem, because he demands the redelivery to him of the arrested vessel. *The right of possessing the quasi personified vessel proceeded against in rem*—i. e., for the enforcement of a maritime lien—*is the foundation of his right to defend, as against the whole libel.*" (Emphasis supplied.)

In The Pietro Campanella v. The Euro case, supra, the court pointed to Admiralty Rule 25,[4] 28 U.S.C.A. following section 723, as the basis of its ruling that the Custodian "cannot properly qualify as the claimant * * * because he had no interest in the ships *at the time* the claims of the Italian owners were filed * * *." (Emphasis supplied.) In doing so, the court made reference to United States v. 422 Casks of Wine, 1 Pet. 547, 26 U.S. 547, 7 L.Ed. 257. The Wine case, however, did not so rule. In that case, as here,

there was a libel of information in a cause of seizure and forfeiture. The claimants, while still the owners of the property seized, filed their claim in the forfeiture proceedings and obtained a decree in their favor. The United States then appealed, urging that the claimants were no longer the owners of the wine. The appeal was denied and the Supreme Court affirmed the verdict. However, as is pointed out in the government's brief, the Wine case is clearly distinguishable from the case at bar, for there the new owner of the wine did not go into court and assert a right to be the dominus litis. In fact, the opposite was true, for the real owner had authorized the interposition of the claim and the continued defense of the cause. Said Story, J., (1 Pet. at page 550, 26 U.S. at page 550, 7 L.Ed. 257): "And at all events, we cannot but see, that they had full authority to interpose this claim, by the consent of the real owner; and the irregularity, if any, prejudices no adverse right, and interferes with no rule of justice."

Clearly the transfer to the Custodian of the property interests of the claimant in the vessel, by virtue of the vesting order, was just as effective in this case as was the voluntary assignment of the property right in the Wine case. To rule otherwise would be to distinguish between the effect of a voluntary transfer of title and the transfer of title by operation of law. Certainly it cannot be said that a conveyance by a sheriff of real estate in a foreclosure proceeding gives less of a title than a voluntary conveyance by the owner of the real estate.

The court, in The Pietro Campanella v. The Euro case, also based its refusal to oust the claimant and to substitute the Custodian in his place on the ground that it would make him dominus litis.

I agree that the substitution of the Custodian in place of the claimant would make the Custodian dominus litis. But isn't that what Congress intended in the Trading with the Enemy Act of 1917, as amended by the First War Powers Act of

---

[4] Admiralty Rule 25 provides: "In suits in rem the party claiming the property shall verify his claim on oath or solemn affirmation, stating that the claimant by whom or on whose behalf the claim is made is the true and bona fide owner. And where the claim is put in by an agent or consignee, he shall also make oath that he is duly authorized thereto by the owner; or, if the property be, at the time of the arrest, in the possession of the master of a ship, that he is the lawful bailee thereof for the owner. And, on putting in such claim, the claimant shall file a bond or stipulation for costs as above provided."

1941, Sec. 301, 50 U.S.C.A.Appendix § 616?

The Custodian's statutory authority to make the vesting order flows from Section 5(b) of the Trading with the Enemy Act of 1917, as amended by Section 301 of the First War Powers Act of 1941, and Section 7(c) of the original Trading with the Enemy Act, 50 U.S.C.A.Appendix § 7(c).

The first sentence of Section 5(b) of the Trading with the Enemy Act was drastically modified by the First War Powers Act of 1941, and the material portions of the amended subsection now read as follows: "During the time of war * * *, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise * * * (B) * * * *direct and compel* * * * *any* * * * *transfer* * * *of* * * * *any property in which any foreign country or a national thereof has any interest,* by any person, or with respect to any property, subject to the jurisdiction of the United States; *and any property or interest of any foreign country or national thereof shall vest,* when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, *and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with* in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; * * * ." (Emphasis supplied.)

This statute in itself gives the President the power to delegate his functions. Further, Section 5(a) of the Trading with the Enemy Act, as amended, provides in part as follows: " * * * The President may exercise any power or authority conferred by this Act through such officer or officers as he shall direct."

After the adoption of the amended Section 5(b) and on July 6, 1942, the President, by Executive Order No. 9095, as amended, delegated his powers in the following pertinent language:

"2. The Alien Property Custodian is authorized and empowered to take such action as he deems necessary in the national interest, including, but not limited to, the power to direct, manage, supervise, control or vest, with respect to: * * *

"(e) any ship or vessel or interest therein, in which any foreign country or national thereof has an interest; and

"(f) *any property of any nature whatsoever which is in the process of administration by any person acting under judicial supervision or which is in partition, libel, condemnation or other similar proceedings and which is payable or deliverable to, or claimed by, a designated enemy country or national thereof."* (Emphasis supplied.)

The claimant here stressed the contention that, as dominus litis, the Custodian would have the power to consent to a decree of forfeiture without contest. This question of dominus litis, to my mind, is entirely academic in view of the fact that the claimant cannot be prejudiced by reason of such a situation, because by operation of the vesting order he no longer has any property rights which can be adversely affected thereby.

Using again the analogy of a sheriff sale—suppose one purchased at sheriff sale a chose in action against him held by the debtor in the execution proceeding. Would the debtor's complaint that the purchaser thereby became dominus litis have any standing to permit him to continue as a litigant in the sheriff—assigned chose of action? Certainly not.

Of course, our courts have enunciated great fundamental principles of law which preserve certain rights to enemy aliens which inspire a deep sense of pride in the institutions and governmental principles which inhere in the political structure of our country.

However, in the recent case of Ex parte Kumezo Kawato, 63 S.Ct. 115, 120, 87 L.Ed. ——, the Supreme Court of the United States, while ruling that resident enemy aliens may proceed in all courts, at the same time held that they may do so only "until administrative or legislative action is taken to exclude them." Significantly the Supreme Court declared that the rights of even resident enemy aliens may be abrogated by the United States of America.

In the Kawato case, a resident alien had filed a libel in admiralty against a vessel, claiming wages due him for service as a seaman, and also an allowance for maintenance and cure for injuries sustained in the performance of his duties. The

claimants of the vessel moved to abate the action on the ground that Kawato by reason of the state of war existing between Japan and the United States had become an enemy alien and therefore had no right to prosecute any action in any court of the United States during the pendency of the war. In discussing this contention of the claimants of the vessel, the Supreme Court said: "In asking that the rights of resident aliens be abrogated in their behalf, private litigants in effect seek to stand in the position of government. *But only the government,* and not the private individual, is vested with the power to protect all the people, including loyal aliens, from possible injury by disloyal aliens. *If the public welfare demands that this alien shall not receive compensation for his work or payment for his injuries received in the course of his employment, the government can make the decision without allowing a windfall to these claimants. \* \* \*"* (Emphasis supplied.)

In the instant case, the government, acting through its executive branch under legislative authority, has abrogated the rights of the claimant here and divested him of all his property interests. Such action is decisive and dispositive.

In United States v. Chemical Foundation, 272 U.S. 1, at page 10, 47 S.Ct. 1, at page 4, 71 L.Ed. 131, the Supreme Court of the United States, in discussing the Trading with the Enemy Act of October 6, 1917, stated: "There is nothing to support a strict construction of the act in respect of the seizure and disposition of enemy property. \* \* \* The law should be liberally construed to give effect to the purposes it was enacted to subserve."

Again, 272 U.S. on page 11, 47 S.Ct. on page 5, 71 L.Ed. 131, the court stated: "Congress was untrammeled and free to authorize the seizure, use or appropriation of such properties without any compensation to the owners."

On page 12, of 272 U.S., on page 5 of 47 S.Ct., 71 L.Ed. 131, the court said: "The language of the statute is too plain to be misunderstood. Except as affected by the proviso, the Custodian's dominion over the property and power to dispose of it—acting under the President as provided—were as unlimited as are the powers of an absolute owner, \* \* \*."

In the case cited, the Supreme Court specifically ruled that seizure and sale of enemy patents by the Alien Property Custodian was a valid exercise of the President's power under the Trading with the Enemy Act of 1917. The court also ruled that the vesting in the Custodian of the property interests of the former owners constituted a complete divestment of all of their rights, and that consequently they could not complain that the Custodian had sold their patents for an inadequate consideration, etc. Said the court in this connection (272 U.S. at page 11, 47 S.Ct. at page 5, 71 L.Ed. 131): "There is no constitutional prohibition against confiscation of enemy properties. \* \* \* The former enemy owners have no claim against the patents or the proceeds derived from the sales. It makes no difference to them whether the consideration paid by the Foundation was adequate or inadequate."

Significantly, in United States v. Chemical Foundation, the Supreme Court upheld the right of the Custodian to seize and to sell "choses in action" held by the enemy alien. In the instant case, in the final analysis, the substance of the dispute between the claimant and the Custodian is the claimant's assertion of his property interest in a chose in action—a right to defend in the forfeiture proceedings originally instituted by the United States against the "Antoinetta".

In Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545, the Supreme Court of the United States reaffirmed the principles enunciated in United States v. Chemical Foundation, supra. Said the court (300 U.S. at page 120, 57 S.Ct. at page 362, 81 L.Ed. 545): "Alien enemy owners were divested of every right in respect of the money and property seized and held by the Custodian under the Trading with the Enemy Act."

On page 121 of 300 U.S., on page 362 of 57 S.Ct., 81 L.Ed. 545, the court stated: "As the taking left in enemy owners no beneficial right to, or interest in, the property, the United States did not take or hold as trustee for their benefit. \* \* \* To the extent that the argument rests upon the assumption that the taking did not divest enemy owners *of every right* or that the United States did not acquire absolute title, it is fallacious and need not be noticed."

154

In my opinion United States v. Chemical Foundation and Cummings v. Deutsche Bank are dispositive of the issue involved in the case at bar.

 The claimant's contention here narrows down to the proposition that the Custodian cannot exercise his valid powers simply because the subject matter of the seizure was already the subject of litigation brought by the United States.

To sustain such a contention would be to nullify the intent of the Congress as declared in the Trading with the Enemy Act.

For the reasons stated, I am of the opinion that the orders prayed for in the petition of the Alien Property Custodian should be granted, and that the motions of the claimant should be denied.

An order may be submitted in accordance with this opinion.