Eugene Orme, Individually and Thomas D. Nash, as Administrator with the Will Annexed of the Estate of Louise de Haven, Deceased, Appellees, v. The Northern Trust Company, etc., et al.
On Appeal of William P. Rogers, Attorney General of the United States, etc.

Gen. No. 47,821.

First District, First Division.

January 9, 1961.

Rehearing denied February 9, 1961.

Rehearing denied and opinion modified February 27, 1961.

Dallas S. Townsend, Assistant Attorney General, Director, Office of Alien Property, Chicago, Illinois; R. Tieken, United States Attorney for the Northern District of Illinois; Arthur R. Schor and William H. Arkin, for William P. Rogers, Attorney General, defendant-appellant.

Roland Towle, Floyd E. Thompson, and Thomas P. Sullivan, of Chicago, for appellee cross-appellants Adelheit von Hardenberg, Irmgard von Alten and Irmgard von Schiller; Clausen, Hirsh, Miller, and Gorman, of Chicago (Norman A. Miller and Jerome H. Torshen, of counsel) for defendant cross-appellant Alice Lohrer; C. Lysle Smith and John Alden Powers, of Chicago, for Eugene Orme, Individually, and Thomas D. Nash, Jr., as Administrator De Bonis Non with the Will Annexed of the Estate of Louise de Haven, Deceased, plaintiffs cross-appellants, appellees, and cross-appellees; Dall-

stream, Schiff, Hardin, Waite & Dorschel, of Chicago, (Lester G. Britton, of counsel) for defendant-appellee and cross-appellant, The Northern Trust Company, as Trustee under the Will of Louise de Haven, Deceased.

PRESIDING JUSTICE KILEY delivered the opinion of the court.

This is a suit to construe the will of Mrs. Louisa G. Bigelow, made in Geneva, Switzerland in 1873. Her three minor granddaughters were named primary beneficiaries. In 1941 Louise de Haven, one of the granddaughters, died testate in the United States devising her interest in the Bigelow estate to plaintiff Orme. He sued for construction of the will in 1943 and in 1959 a decree was entered adverse to him. The decree allowed substantial attorneys' fees and the United States Attorney General, a substitute defendant, appealed challenging the allowances. Orme and several other parties then cross-appealed.

Mrs. Bigelow sojourned in Geneva, Switzerland from about 1871 until her death in 1873. She had made her will on May 26, 1873. Her three granddaughters, Josephine, Louise and Sarah de Haven, then eight, six and four years old respectively, resided with her and were her only heirs at law. At her death Mrs. Bigelow owned a number of parcels of Chicago real estate which she devised as part of the corpus of a testamentary trust provided for in her will. The real estate itself has been sold since the filing of the present suit, and the proceeds are trust assets. The Northern Trust Company, as successor trustee, is administering the trust.

Under the Bigelow will the trustees were directed to collect the income from the real estate, pay expenses, and pay over the residue of the income to the three granddaughters "in equal parts, individually, during their natural lives." The trust corpus was to be dis-

80

tributed only on the death of all three grandchildren. Then the estate was to be divided equally among the "children or heirs" of the grandchildren, "one-third to the child or children, heirs or heirs" of each grandchild.

Josephine de Haven Caldwell, the eldest grandchild, died intestate in 1919 leaving her five children as her only heirs at law. Louise de Haven married Baron Curt von Alten, a German citizen, in 1896. She had two daughters, who are German nationals. She became estranged from her family before World War I, returned to this country after the war, obtained a Nevada divorce from her German husband in 1921, in 1923 adopted Raymond Edwin de Haven and died testate in 1941. In her will she named plaintiff Orme devisee of her interest in the Bigelow estate. Sarah de Haven married Hans von Campe who died before her. She died in Switzerland in 1951, leaving three children and a will devising to her daughter, defendant Alice von Campe Lohrer, whatever interest she had under the Bigelow will.

On March 22, 1949, the Attorney General, as Successor to the Alien Property Custodian by virtue of the Trading With The Enemy Act, vested the interests of the German nationals, original defendants, including the daughters of Louise de Haven. His petition for leave to appear and defend in lieu of the German nationals was granted, and on appeal to the Supreme Court in 1952, the order of substitution was sustained. Orme v. Northern Trust Co., 410 Ill. 354 (1951), cert. denied, Von Hardenberg v. McGrath, 343 U. S. 921 (1952).

When Josephine Caldwell died her children demanded the income which had been previously paid her. The Trustee declined to accede to the demand because the Bigelow will made no express provision for disposition of the income upon the death of a granddaughter leaving issue surviving. It provided only for disposi-

tion of income in the event of the death of a granddaughter "without issue surviving." The Caldwell children sued for construction of the will and a decree was entered granting the income to four of Josephine's children and her daughter-in-law and the latter's children. This decree is called the "1920 decree."

The pleadings in the instant case raised the issues whether the "1920 decree" was res judicata of Orme's suit; whether the Rule in Shelley's case applied so as to enable Louise de Haven to devise her interest to Orme; and whether Raymond de Haven qualified as a beneficiary under the Bigelow will. The issues were referred to a Master in Chancery who found that the 1920 decree "necessarily" decided the Rule in Shelley's case did not apply to vest a fee in Louise de Haven. But he also construed the will against Orme. He also found that Raymond de Haven did not qualify as a beneficiary under the Bigelow will. The Master recommended a decree accordingly. The Chancellor approved the report and decreed that the Bigelow will was valid, "capable of construction" and under it the three granddaughters of Mrs. Bigelow were given life estates with remainders to the heirs of their bodies. And the decree allowed the various parties the attorneys' fees recommended by the Master.

We shall consider the issues on appeal necessary for our decision in what we consider the most logical order.

I. RES JUDICATA

The Caldwell decree in 1920 awarded the income from Josephine's share to her children, with the share of her son William going to his wife and children as a result of certain conveyances by William through Josephine to them. In dictum the Chancellor sought to apply the construction with respect to Josephine's share to the interests of Louise and Sarah.

Cross-appellants Caldwells and the Attorney General contend that the "1920 decree" is res judicata and

bars Orme's claim that the Rule in Shelley's case operated to vest a fee in Louise de Haven and that he is owner of her fee interest by virtue of the devise in her will. They say that that decree necessarily decided that the Rule in Shelley's case did not apply and that the decree settled the question of the interests of Louise and Sarah de Haven as well as that of Josephine.

We think that the 1920 decree is not res judicata of the issue raised by Orme. The decree does not expressly hold that the Rule in Shelley's case did not apply to Josephine Caldwell's interest nor did the dictum as to Louise and Sarah's interest mention the Rule. The decree did not find either that they took by descent through Josephine or that they took by purchase through the Bigelow will. To decide the questions before him the Chancellor in 1920 did not necessarily have to determine by which of the two alternative methods Josephine's interest passed to her children. This he carefully avoided. We agree with Orme that the 1920 decree states the result of a construction but does not state the method of construction or interpretation of the language of the will.

This conclusion on the res judicata issue coincides with that of three Chancellors before whom motions to strike and dismiss Orme's suit were made.

## II. RULE IN SHELLEY'S CASE

In paragraph 6th of the will, after providing life estates in the income for her three granddaughters, Mrs. Bigelow directed that no division of the corpus should be made until the "death of all" three; then all of her property was to "be divided equally among the children or heirs of [her] grandchildren. . . , one third to the child or children, heir or heirs" of each. She went on to provide for gifts over in the event of a death "without issue."

Plaintiff Orme contends the words "children or heirs," properly construed, means heirs in the techni-

cal, legal sense and that consequently the Rule in Shelley's case operates so as to vest in Louise de Haven a fee simple interest in the Chicago real estate which she devised to him.

No Illinois case has construed the precise words "children or heirs." Plaintiff cites the Pennsylvania case of Shapley v. Diehl, 203 Pa. 566, 53 Atl. 374 (1902) wherein the words "children or heirs" were used. That case is distinguished from this because under a Pennsylvania statute fee tails merge to create a fee in the first taker. Therefore the court had only to determine that the term "children or heirs" described an estate in fee tail. Even if "children or heirs" was there construed to mean "issue" the Pennsylvania court could have applied the Rule in Shelley's case. In Illinois the Rule applies only when the words can be construed to mean "heirs" in the technical sense. Hanes v. Central Ill. Utilities Co., 262 Ill. 86, 104 N. E. 156 (1914). The case, moreover, was not complicated by gifts over as in the Bigelow will. Finally, in the Pennsylvania case there was but one Shapley child in existence when the will was made, this "naturally suggesting the very common form of expression 'child or children.' " 53 Atl. at 375. The court there, as our Supreme Court has done in Hartwick v. Heberling, 364 Ill. 523, 537 (1936), 4 N.E.2d 965, took into consideration the fact of children in existence in resolving ambiguities. It suggested that the grantor, "the thought occurring to him that there might not be any children, . . . added 'or heirs' to complete the expression of his intent." 53 Atl. at 375. Here, however, Mrs. Bigelow's estate plan anticipates children or their lineal descendants surviving.

Where the word "heirs" is used it should be given its technical meaning unless qualified by other language which shows beyond reasonable doubt that a different meaning be given. Kaup v. Weathers, 302 Ill. 569 (1922). On the other hand " 'children' . . .

84

does not ordinarily mean 'heirs' . . . unless the context of the will leaves no doubt of such intention." Hanes v. Central Ill. Utilities Co., 262 Ill. 86, 89, 104 N. E. 156 (1914). Also, although "the word 'issue' as a general thing, means lineal descendants indefinitely, . . . whether it means descendants generally, or merely children, will depend upon the intention of the testator . . ." gleaned from the entire will. Arnold v. Alden, 173 Ill. 229, 238–39, 50 N. E. 704 (1898). The ordinary meaning of "issue" is "to proceed out of; offspring of a common ancestor; and includes not only a child but descendants of a child." Miller v. Wick, 311 Ill. 269, 275, 142 N. E. 490 (1924); Tree v. Continental Ill. Nat. Bank & Trust Co., 346 Ill. App. 509, 521, 105 N.E.2d 324 (1952).

■ The meaning of each of the words "children," "heirs," or "issue," standing alone, may be influenced by other language in a will and when used together their total meaning may be influenced by each other as well as by other language in the will. See Porter v. Cutler, 380 Ill. 215, 43 N.E.2d 929 (1942); Noe v. Moseley, 377 Ill. 152, 36 N.E.2d 240 (1941); Hege v. Provident Mut. Life Ins. Co., 341 Ill. 559, 173 N. E. 610 (1930); Patterson v. McCay, 313 Ill. 491, 145 N. E. 87 (1924); Kaup v. Weathers, 302 Ill. 569, 35 N. E. 38 (1922); Cook v. Sober, 302 Ill. 498, 135 N. E. 60 (1922); Lee v. Roberson, 297 Ill. 321, 130 N. E. 774 (1921); Sellers v. Rike, 292 Ill. 468, 127 N. E. 24 (1920); Stisser v. Stisser, 235 Ill. 207, 85 N. E. 240 (1908); Dick v. Ricker, 222 Ill. 413, 78 N. E. 823 (1906); Fishback v. Joesting, 183 Ill. 463, 56 N. E. 62 (1899); Ryan v. Allen, 120 Ill. 648, 12 N. E. 65 (1887); Leiter v. Sheppard, 85 Ill. 242 (1877); Kales, Future Interests §§ 551–52 (2d ed. 1920).

The result of this survey indicates the wisdom of the Supreme Court's expression in Hartwick v. Heberling, 364 Ill. 523, 529, 4 N.E.2d 965 (1936): "While decisions

involving wills may serve to guide this court with respect to general rules as to construction to be placed upon the will under consideration, yet unless the case be in every respect directly in point, the decision will not control but at most will only be persuasive."

■ The Rule in Shelley's case is not a rule of construction, but a rule of property. Porter v. Cutler, 380 Ill. 215 (1942); Lydick v. Tate, 380 Ill. 616, 44 N.E.2d 583 (1942). We must first construe the language and determine the intention of Mrs. Bigelow before turning to the question of the application of the Rule.

In paragraph 5th of the Article Second Mrs. Bigelow provides: "In case of the death of either of my said Grandchildren (without issue surviving), then the said residue of said income, is to be paid in equal parts . . . to the survivors or survivor, or their legal representatives, or heirs, . . . the one part (or half) going to one of my grandchildren or her heirs, and the other to the other or her heirs. . . ." A technical meaning of "heirs" here would impute to the testator an intention to give greater benefit to the heirs of a granddaughter who survived another of the granddaughters dying without issue. For if the first granddaughter died without issue, her heirs could take nothing because of the express provisions for gift over in such case. Also, a gift over provision, in the paragraph, to the survivor in case of death of two of the Grandchildren "without issue surviving" would be inconsistent with any intention to benefit the heirs (used in a technical sense) of either of the two predeceased grandchildren. We think, therefore, in paragraph 5th "heirs" is not being used in the technical sense.

■ Paragraph 7th provides that "in the event of the death of all my said Grandchildren, without issue, or heirs, then the said property, real and personal" should go to the testator's "immediate heirs, and legal representatives, according to and in pursuance of the

86

Laws of the State of Illinois." This ultimate disposition depends on the death of the three grandchildren without "heirs" as well as without "issue." It is apparent that Mrs. Bigelow distinguished between "heirs" and "immediate heirs." The phrase "immediate heirs and legal representatives under the statutes of the State of Illinois" is held to mean "heirs" in the technical sense. People v. Emery, 314 Ill. 220, 145 N. E. 349 (1924). If she meant "heirs" technically she could not have anticipated husbands, for husbands of the grandchildren would be their heirs. But in paragraph 6th she did anticipate husbands in the provision "that said property, real and personal, shall remain intact free from the husbands or husband of any or either. . . ." She could not reasonably have meant that if the grandchildren died not having children but having husbands the gift over would not take place. She consistently tried to keep her property from anyone except the grandchildren and their children or lineal descendants.

We disagree with Orme that the exclusion of husbands in paragraph 6th pertains to life estates "of necessity." Mrs. Bigelow expressly provided to keep "intact, free from the husbands," property, "real and personal." This would include corpus and income.

In paragraph 6th provision is made for a life estate to each of the three granddaughters, with remainder interests upon the death of the last survivor to go to their "children or heirs." If one of the granddaughters should die "without issue," then the property was to be "apportioned to the issue, heir or heirs" of the two surviving grandchildren. Construing "heirs" in the technical sense would give to the heirs of a survivor and deprive the heirs of the decedent, when Mrs. Bigelow's evident affection for them does not warrant that discrimination. Furthermore, Mrs. Bigelow expressed the desire to exclude husbands and repeats that after

the death of each grandchild the property be divided "among their issue as hereinbefore specified." The specification was in paragraph 5th where she already used the word "heirs" and where, as we conclude hereinafter, "issue" could not mean "heirs," and "heirs" must mean "issue."

Plaintiff concedes the words "issue as hereinbefore specified" in paragraph 6th are inconsistent with the previous "children or heirs," and that either "heirs" or "issue" was used inadvertently. And we are not persuaded by him that the broader word "heirs" takes into itself the meaning of "issue" when used together. The two words are not always linked together in the will and not always the same way; and the superadded word is "heirs", i. e., "children or heirs" not "heirs or children," and "issue or heirs" not "heirs or issue."

The Master found that in paragraph 6th "without issue" clearly indicates no intention of indefinite succession and negates the idea of "heir" technically, because there would be no gift over after the previous death of other grandchildren if "heirs" meant heirs generally. In Hartwick v. Heberling, 364 Ill. 523, 4 N.E.2d 965 (1936), gifts over were shown to be a factor and the Master was justified in considering the gift over in determining what the testator meant by the ambiguous language.

■ We are of the opinion that Mrs. Bigelow intended "issue" by the word "children or heirs" and that, therefore, the Rule in Shelley's case does not apply. We agree with the construction by the Master and confirmed by the Chancellor; i. e., Mrs. Bigelow "by her said Will gave equitable life estates to her three granddaughters therein named . . . but did not give any equitable remainder to vest . . . in the heirs at law of such granddaughters, and therefore . . . the Rule in Shelley's case is not applicable."

This conclusion makes it unnecessary to consider other reasons why the Rule in Shelley's case should not apply.

## III. THE CALDWELL MOTIONS

We disagree that the Caldwell motion to dismiss should have been sustained. We have approved the Chancellor's finding that Orme's suit presented an ambiguity needing construction and the finding that the Rule in Shelley's case did not apply. We have decided the "1920 decree" is not res judicata. And we see no basis for a claim of laches since Louise de Haven died in 1941 and Orme sued in 1943.

As to the motion for judgment on the pleadings, we agree with the Chancellor that the decree protected the interests of the Caldwells which their motion was designed to protect and "no purpose" would be served by passing on the motion.

## IV. RAYMOND DE HAVEN ADOPTION

Raymond de Haven contends that by reason of his adoption by Louise de Haven he qualifies to take under the gift, in the Bigelow will, to the "child or children, heir or heirs" of Mrs. Bigelow's granddaughters.

The decree found that "De Haven is not a member of this class [issue of the body] and has no interest in any of the trust property. . . ."

De Haven relies upon the "modern view" which accords adopted children a status of inheritance equivalent to that of natural children. As evidence of the trend he cites In re Stanford's Estate, 49 Cal.2d 120, 315 P.2d 681 (1957); In re Heard's Estate, 49 Cal.2d 514, 319 P.2d 637 (1957); Edmands v. Tice, 324 S.W.2d 491 (Ky. 1958); Hayes v. St. Louis Union Trust Co., 280 S.W.2d 649 (Mo. 1955).

■ Our legislature seems to have taken a step toward the "modern view" in its recent amendments

to the Administration of Estate and Adoption Acts. However, the amendments are prospective in application and the law in effect when the Bigelow will was made and at the death of the testator in 1873 controls the question before us. Under the law prior to the recent amendments, the word "issue" would not include an adopted child unless the language of the will clearly shows the intention, or the language and surrounding circumstances if necessary to go beyond the language. Stewart v. Lafferty, 12 Ill.2d 224, 145 N.E.2d 640 (1957).

When the will was made the granddaughters were small children. It is highly unlikely that Mrs. Bigelow had in mind when she made the will the probability of great grandchildren by adoption. We hold that Raymond de Haven, as an adoptee of Louise de Haven, does not qualify to take under the Bigelow will.

## V. FEES

We think the Chancellor was justified in finding that plaintiff's suit presented ambiguities in the will which required construction and we have agreed with that construction. A reasonable allowance of fees was, therefore, proper.

The trust is chargeable with the reasonable fees of attorneys for plaintiff or any defendant or cross complainant having an interest in the construction of the will. Brumsey v. Brumsey, 351 Ill. 414, 427, 184 N. E. 627 (1933); Dean v. Northern Trust Co., 266 Ill. 205, 211, 107 N. E. 186 (1914). The question in the cases is whether there is an honest difference of opinion as to the proper construction. Strickland v. Strickland, 271 Ill. 614, 621, 111 N. E. 592 (1916). And an adverse ruling does not preclude application of the rule. Cravens v. Haas, 318 Ill. App. 447, 48 N.E.2d 611 (1943).

The Attorney General contends that the Master applied inappropriate standards which he improperly

applied in favor of persons having no substantial interest in the suit; did not confine compensation to the services on the will construction issue; and that payment for duplicate services was error.

■ The Master and Chancellor adopted a cover-all rate of $25.00 per hour for legal services, for the reasons that:

A. Where fees are paid out of a fund, a more conservative rate is adopted than is customarily used for an attorney and client who have freely agreed upon compensation.

B. That commonly, the compensation of a judge is the test applied in situations like the one before us.

There was added to the rate earned by judges an allowance for overhead which lawyers have and judges do not. This matter was discretionary with the Chancellor and we are not persuaded that he abused his discretion in adopting this rate.

■ The Attorney General complains "that despite the fact that the Master recommended that virtually all of the services of plaintiff's counsel were compensable he employed different standards in setting fees for the other parties." He argues that "in some cases only those services connected with the problems raised on construction were held compensable and this . . . was based upon considered guesses." For example, the Master accepted the 40% factor for computing time devoted to construction by the Attorney General, but a 50% factor was used to evaluate time spent by the Caldwells' attorneys "and this despite the fact that that firm stood on their motions for judgment on the pleadings and refused to participate in the hearings on the merits." He does not complain that his compensation was based on actual costs of the services to the government rather than on the rates set by the Chancellor.

91

We do not think that the Chancellor abused his discretion in this matter since the forty per cent ruling was based on the Attorney General's own estimate and the fifty per cent figure was based upon the Master's view of the "divisions of their brief." There were allowances for some duplication of services, but the unique nature of this litigation and its multiplicity of pleadings covering interests of various parties over a long period of time would normally result in some duplication. We see no error in these matters.

■ Plaintiff's attorneys claimed $112,880.00 for 3,643 hours work and were allowed $89,550.00. The Attorney General contends the allowance should not have exceeded $36,000.00. We have examined the schedules filed in support of the claim and see no reason to upset the allowance. The rendering of services began in 1942 and the nature of the controversy precluded a narrow limitation of services on the will itself. This is not the usual will construction case.

The Trustee requested $105,000.00 and was allowed $84,712.50 for fees for services beginning in 1943. It does not complain about the finding as to the time expended but about the insufficiency of the rate in view of the excellence of its attorneys. There is no showing that the Chancellor should have made a distinction between the skills of the attorneys rendering services for the various parties.

■ A question is raised about the fee allowance for de Haven's attorneys. Whether de Haven was a child or heir was a relevant point at the hearing. It was of substantial interest, and he was a proper party. The decree permanently removed his claim from the Bigelow will controversy and to that extent aided all having interests. Furthermore, de Haven was interested in defending because if Orme prevailed de Haven's claim would fail. Being drawn into the case, de

92

Haven engaged attorneys who contributed to the solution of the ambiguity in the Bigelow will so far as it related to him.

The Master disallowed time spent by de Haven's attorneys in defending the issue raised by the Attorney General as to the validity of the adoption. We think this was error. He was allowed $6,035.00 for services on his right to take under the Bigelow will. Defense of his adoption was a necessary prerequisite to these services. De Haven's attorneys were entitled to an additional sum of $1,625.00 for 65 hours at $25.00 per hour and $1,530.00 for 102 hours at $15.00 per hour for a total of $3,155.00 additional allowance.

Attorneys for the Caldwell interests who entered the case in 1946 were allowed fees of $1,875.00. No fees were allowed the original attorneys who "made no contribution or any aid on the construction problem." The Caldwell defendants had an interest in protecting themselves against an adverse interpretation of the 1920 decree in order to avoid a possible tax liability and in protecting their share from the total fee allowances. If the court held that the Caldwell interest was taken by descent rather than by purchase under the trust, they "would then be thirty-nine years late in filing Federal Estate and State Inheritance Tax returns, and the tax, and interest and penalties, could wipe out completely [their] remaining distributive share of this trust."

The attorneys for Alice Lohrer and Kraft Administrator were allowed $9,102.50. Their services rendered on tax problems were excluded, but services rendered in defining their interests in the trust estate, were included. The attorneys for the Sarah von Campe interests were allowed $700.00 by the Master "without insisting on detail" but, appropriately, no fees were

allowed for work on the Rule Against Perpetuities question.

The decree allowed the attorney for certain German nationals $7,500.00 for fees and $332.86 for costs and expenses prior to the order substituting the Attorney General in 1949. Fees were denied for any services rendered after the 1949 vesting of the Attorney General. Complaint is made of this disallowance.

The Attorney General's vesting order was made in March 1949. In November 1950 the appearance of the German nationals was struck and the Attorney General substituted in their stead. They appealed to the Supreme Court of Illinois, raising contentions similar to those raised now on appeal of the vesting order. The order was affirmed. Orme v. Northern Trust Co., 410 Ill. 354, 102 N.E.2d 335 (1951). The Supreme Court denied a petition for certiorari. Von Hardenberg v. McGrath, 343 U. S. 921 (1952). The Illinois Supreme Court decision is res judicata of the questions raised by the German nationals on this appeal. That opinion was expressly made "without prejudice" to possible future litigation seeking "revesting." That has no bearing in this litigation.

The interests of the German nationals was not freed under General License 94. That License applied to interests acquired after January 1, 1947 and the interests here in question concededly came into existence, at the latest, upon the death of their mother, the life tenant, in 1941. The Supreme Court in Helvering v. San Joaquin Co., 297 U. S. 496 (1936), interpreted the word "acquire" within the contemplation of the revenue acts in the manner contended for by the German nationals, but, in contemplation of the purpose of the Trading With The Enemy Act, we think our conclusion as to the acquisition is right.

■ The order vesting the Attorney General with the interests of the German nationals on March 29,

1949, divested them of their interests in the trust property. Cummings v. Deutsche Bank, 300 U. S. 115, 121 (1937). After that date they no longer had an interest in the trust and were no longer proper parties to the suit. We conclude the Chancellor correctly limited compensable services to the period before the vesting order.

When plaintiff began this suit the German nationals and Mrs. von Schiller had interests under the will and were named defendants. Their interests were then being challenged by Orme's suit and they aided the court's construction. We see no reason to interfere with the Chancellor's allowances and disallowances with respect to the interests of the German nationals and Mrs. von Schiller.

We will not discuss other allowances made by the Chancellor, but to which no objection was made on this appeal which has not already been answered with respect to other parties.

 We have found that the allowances to the individual attorneys were not unreasonable. We are unable to say, therefore, that the total allowance of $221,-901.33, which includes the additional sum for de Haven, out of the shares of the estate valued at about one and one-half million dollars is unreasonable. In Logan v. Harris Trust & Sav. Bank, 8 Ill.App.2d 61, 130 N.E.2d 211 (1955), 23% of a $65,000 estate was held excessive. Here the allowance is about 14% of an estate of one and one-half million. Also, the case here is unique in its history and facts.

Justice McSurely said in Continental Ill. Nat. Bank & Trust Co. v. Hardeen, 306 Ill. App. 123, 131, 28 N.E.2d 124 (1940), "while, possibly, we might not agree as to every item, we see no reason to conclude that the allowances were unreasonable." That is our view here. The Chancellor has had long and broad experience and

was acquainted with the character and amount of the services rendered in this litigation.

It was not error to charge the expense of this suit against the share of Louise de Haven and Sarah von Campe only. The various interests involved in the share of Josephine Caldwell were not involved in this suit and it would have been unjust to tax that share with the costs of litigation which concerned the other two shares. The instant suit was, however, indirectly an attack upon the 1920 decree which settled the questions of the Caldwell share of the Bigelow estate. For this reason, we agree with the Chancellor that the Caldwell defendants "were forced . . . in . . . here without choice and should not be burdened with the costs and expenses thus far." We agree with the Chancellor that part of the Trustee's fees were chargeable against the Caldwells.

We think, too, that the court properly allowed fees to be charged against the Sarah von Campe share of the trust estate. This suit was directed at the interest of the Louise de Haven share, but the construction of the will in the decree settled definitively for the first time the interest of Sarah von Campe and her daughter, Alice Lohrer, as well as that of the Louise de Haven share. That the suit was a matter of concern to them is indicated by Alice Lohrer's adoption of the arguments in the brief submitted on behalf of the Caldwell interests, of the trustee and of the Attorney General. The share of Sarah von Campe was "in question" when the will was construed and we can see no abuse of discretion in the Chancellor's charging that share with one-half of the expenses of the construction.

The services rendered in behalf of Raymond de Haven's claim, and for defense of his adoption, however, had nothing to do with the Sarah von Campe

share. The fees for those services should have been charged against the Louise de Haven share.

We approve the decree except as to the disallowances of fees to the attorneys for Raymond de Haven for services in defending the adoption decree. We are modifying the decree by adding the amount of $3,155.00 to that allowance, and by assessing all the fees allowed Raymond de Haven against the Louise de Haven share.

For the reasons given the decree, as modified, is affirmed.

Affirmed as modified.

BURMAN and MURPHY, JJ., concur.